Mark P. Ladner (admitted *pro hac vice*)
mladner@mofo.com
Michael B. Miller (admitted *pro hac vice*)
mbmiller@mofo.com
Jeffrey K. Rosenberg (SBN 264902)
JRosenberg@mofo.com
**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas
New York, New York  10104
Telephone:    212.468.8000
Facsimile:    212.468.7900

*Attorneys for Defendants*
BANK OF AMERICA CORPORATION;
BANK OF AMERICA, N.A.

*Additional counsel appears on following page.*

Stuart C. Plunkett (SBN 187971)
splunkett@mofo.com
**MORRISON & FOERSTER LLP**
425 Market Street
San Francisco, California 94105
Telephone: 415.268.7000
Facsimile: 415.268.7522

*Attorney for Defendants*
BANK OF AMERICA CORPORATION;
BANK OF AMERICA, N.A.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| MELVIN SALVESON *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JP MORGAN CHASE & CO. *et al.*,<br><br>Defendants. | Case No. 4:13-cv-05816-SBA<br><br>**CLASS ACTION**<br><br>**DECLARATION OF JEFFREY ROSENBERG IN SUPPORT OF DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**<br><br>Hon. Saundra Brown Armstrong |

ANDREW J. FRACKMAN (admitted *pro hac vice*)
ABBY F. RUDZIN (admitted *pro hac vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: 212-326-2000
Facsimile:  212-326-2061
Email: afrackman@omm.com
Email: arudzin@omm.com

MATT POWERS (SBN 212682)
**O'MELVENY & MYERS LLP**
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: 415-984-8700
Facsimile: 415-984-8701
Email: mpowers@omm.com

*Attorneys for Defendants*
CAPITAL ONE F.S.B.;
CAPITAL ONE FINANCIAL CORPORATION;
CAPITAL ONE BANK.


DAVID LESSER
**WILMER CUTLER PICKERING HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: 212-230-8800
Facsimile: 212-230-8888
Email: david.lesser@wilmerhale.com

MICHAEL A. MUGMON (SBN 251958)
**WILMER CUTLER PICKERING HALE AND DORR LLP**
950 Page Mill Rd
Palo Alto, CA 94304
Telephone: 650.858.6103
Facsimile: 650.858.6100
Email: michael.mugmon@wilmerhale.com

*Attorneys for Defendants*
HSBC FINANCE CORPORATION;
HSBC BANK USA, N.A.

TIMOTHY A. MILLER (SBN 154744)
**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**
525 University Avenue
Palo Alto, CA 94301
Telephone: 650-470-4620
Facsimile:  650-470-4570

*Attorney for Defendants*
JPMORGAN CHASE & CO.;
JPMORGAN CHASE BANK, N.A.

1    I, JEFFREY ROSENBERG, declare as follows:

2       1. I am an attorney licensed to practice before the courts of the State of California, and an

3    associate with the law firm of Morrison & Foerster LLP, attorneys for defendants Bank of

4    America Corporation and Bank of America, N.A.  I make this declaration in support of

5    defendants' Motions to Dismiss and Request for Judicial Notice.  I have personal knowledge of

6    the matters set forth herein and, if called to testify, could and would testify competently to the

7    following.

8       2. Attached as Exhibit A is a true and correct copy of the Second Consolidated Amended

9    Class Action Complaint filed in *In re Payment Card Interchange Fee and Merchant Discount*

10   *Antitrust Litigation*, No. 05-MD-1720 (E.D.N.Y. Feb. 20, 2009) (ECF No. 1153).

11      I declare under penalty of perjury under the laws of the State of California that the

12   foregoing is true and correct.  Executed this 28th day of March, 2014, in New York, New York.

13

14   _____
     Jeffrey Rosenberg

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE                                               MASTER FILE NO. 1:05-md-1720-JG-JO

PAYMENT CARD INTERCHANGE FEE
AND MERCHANT-DISCOUNT
ANTITRUST LITIGATION

This Document Relates To:  All Class Actions

| | | |
|---|---|---|
| 1:05-cv-03800 | 1:05-cv-05081 | **SECOND CONSOLIDATED AMENDED** |
| 1:05-cv-03924 | 1:05-cv-05082 | **CLASS ACTION COMPLAINT** |
| 1:05-cv-04194 | 1:05-cv-05083 | |
| 1:05-cv-04520 | 1:05-cv-05153 | **JURY TRIAL DEMANDED** |
| 1:05-cv-04521 | 1:05-cv-05207 | |
| 1:05-cv-04728 | 1:05-cv-05319 | |
| 1:05-cv-04974 | 1:05-cv-05866 | |
| 1:05-cv-04974 | 1:05-cv-05868 | |
| 1:05-cv-05069 | 1:05-cv-05869 | |
| 1:05-cv-05070 | 1:05-cv-05870 | |
| 1:05-cv-05071 | 1:05-cv-05871 | |
| 1:05-cv-05072 | 1:05-cv-05878 | |
| 1:05-cv-05073 | 1:05-cv-05879 | |
| 1:05-cv-05074 | 1:05-cv-05880 | |
| 1:05-cv-05075 | 1:05-cv-05881 | |
| 1:05-cv-05076 | 1:05-cv-05882 | |
| 1:05-cv-05077 | 1:05-cv-05883 | |
| 1:05-cv-05080 | 1:05-cv-05885 | |

## I. PREAMBLE

1.      For more than 40 years America's largest banks have fixed the fees imposed on Merchants for transactions processed over the Visa and MasterCard Networks and have collectively imposed restrictions on Merchants that prevent them from protecting themselves against those fees. Despite the Networks' and the banks' recent attempts to avoid antitrust liability by re-structuring the Visa and MasterCard corporate entities, their conduct continues to violate the Sherman Act.  In this Complaint, two nationwide classes of Merchants seek monetary damages to compensate them for the overcharges caused by this illegal conspiracy and equitable relief to protect themselves

against continuing and future harm.

2.      Plaintiffs Photos Etc. Corporation; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS Inc.; Coburn's Incorporated; Crystal Rock LLC; D'Agostino Supermarkets; Discount Optics, Inc.; Jetro Holdings, Inc. and Jetro Cash & Carry Enterprises, LLC; Leon's Transmission Service, Inc.; Parkway Corp.; and Payless ShoeSource, Inc. (collectively the "Merchant Plaintiffs"), Affiliated Foods Midwest Cooperative, Inc.; National Association of Convenience Stores; NATSO, Inc.; National Community Pharmacists Association; National Cooperative Grocers Association; National Grocers Association; and National Restaurant Association (collectively the "Trade-Association Plaintiffs") on behalf of themselves and two classes of Merchants, by their undersigned attorneys herein, allege for their Complaint against Visa U.S.A., Inc., Visa International Service Association, and Visa, Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), and the other Defendants named in this Complaint ("Bank Defendants") (collectively referred to as "Defendants") as follows:

3.      This Complaint is set forth in five parts.  Part One relates to all claims that the Plaintiffs assert.  Part Two relates to the First through Ninth Claims that challenge the collective fixing of uniform Credit Card Interchange Fees by Visa and MasterCard Member Banks and other practices that facilitate this practice.  Part Three relates to the Tenth through Thirteenth Claims that challenge the collective fixing of uniform Offline Debit Card Interchange Fees by Visa, MasterCard and their Member Banks.  Part Four relates to the Fourteenth through Sixteenth Claims that challenge the collective fixing of uniform PIN-Debit Card Interchange Fees by Visa and its Member Banks.  Finally, Part Five relates to the Seventeenth through Twentieth Claims, which challenge Defendants' continuing violations of Section 1 of the Sherman Act after their restructuring attempts.  Plaintiffs' allegations are based upon knowledge with respect to their own

- 2 -

acts and upon information and belief with respect to all other matters.

# PART ONE: ALLEGATIONS COMMON TO ALL CLAIMS

## I.

## INTRODUCTION

1.      The Merchant Plaintiffs operate commercial businesses throughout the United States that have accepted Visa and MasterCard Credit Cards, Offline Debit Cards, and Interlink PIN-Debit Cards as forms of payment, along with cash, checks, travelers checks, and other plastic Credit, Debit, and Charge Cards.

2.      The Trade-Association Plaintiffs are each comprised of members that operate commercial establishments in the United States which accept Visa and MasterCard Credit Cards and Offline Debit Cards and/or Interlink PIN-Debit Cards as forms of payment along with cash, checks, travelers checks, and other plastic Credit, Debit, and Charge Cards.

3.      Together, the Merchant Plaintiffs and the Trade-Association Plaintiffs (hereinafter "Plaintiffs") represent two classes of millions of Merchants that accept Visa and MasterCard Credit and Offline Debit Cards and Interlink PIN-Debit Cards as forms of payment, and challenge the collusive and anticompetitive practices of the Defendants under the antitrust laws of the United States and the State of California.  The contracts, combinations, conspiracies, and understandings entered into by the Defendants harm competition and impose upon Plaintiffs and Class Members supracompetitive, exorbitant, and collectively-fixed prices in the Relevant Markets defined herein.

4.      The contracts, combinations, and conspiracies in restraint of trade, are illegal under Section 1 of the Sherman Act and the California Cartwright Act.  Further, the Anti-Steering Restraints and other exclusionary practices constitute illegal monopolization under Section 2 of the Sherman Act.

- 3 -

## II.

## JURISDICTION AND VENUE

5.       This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. Section 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and for damages under § 4 of the Clayton Act, 15 U.S.C. § 15.   This Court has jurisdiction over Plaintiffs' federal antitrust claims under 28 U.S.C. §§ 1331, 1337, 2201, and 2202.

6.       This Court has original jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1332.  The aggregate amount in controversy for this class action exceeds $5,000,000 and less than one-third of all class members reside in New York.  This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

7.       Venue in the Eastern District of New York is proper under 28 U.S.C. §§ 1391, 1407 and 15 U.S.C. §§ 15, 22, and 26.  Several of the Merchant Plaintiffs operate retail outlets in the District.  The Trade-Association Plaintiffs' members include Merchants that transact business in this District.  Defendants transact business and are found in the Eastern District of New York. Thousands of Merchants located in the Eastern District of New York accept Visa and/or MasterCard Credit Cards and Debit Cards issued by one or more Defendants and, thus, are Class Members.  Hundreds of Visa and/or MasterCard Member Banks, including many of the banks named as Defendants, issue Visa and MasterCard Credit Cards and Debit Cards and/or acquire retail Merchant transactions for Visa and/or MasterCard in the Eastern District of New York.  A substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within the Eastern District of New York.  The acts complained of have had, and will have, substantial anticompetitive effects in the Eastern District of New York.

- 4 -

# III.

# DEFINITIONS

8.      As used in this Complaint, the following terms are defined as:

a.      "Access Device" means any device, including but not limited to a Payment Card or microchip, that may be used by a consumer to initiate a General Purpose Card or Debit Card transaction.

b.      "Acquiring Bank" or "Acquirer" means a member of Visa and/or MasterCard that acquires payment transactions from Merchants and acts as a liaison between the Merchant, the Issuing Bank, and the Payment-Card Network to assist in processing the payment transaction. Visa and MasterCard rules require that an Acquiring Bank be a party to every Merchant contract.  In a typical payment transaction, when a customer presents a Visa or MasterCard card for payment, the Merchant relays the transaction information to the Acquiring Bank. The Acquiring Bank then contacts the Issuing Bank via the network for authorization based on available credit or funds.  Acquiring Banks compete with each other for the right to acquire payment transactions from Merchants but do not compete on the basis of the interchange fee, which is the subject of this Complaint.

c.      "All-Outlets Rule" is a rule of the Visa and MasterCard Networks that requires a Merchant with multiple outlets to accept Visa or MasterCard, respectively, in all of its outlets, even if those outlets are owned by a separate corporate entity, operated under a different brand name, or employ a different business model in order for the Merchant to receive the interchange rates for which the Merchant would ordinarily qualify.

d.      "Anti-Steering Restraints" are the rules of the Visa and MasterCard Networks that forbid Merchants from incenting consumers to use less expensive payment forms, including: the No-Surcharge Rule; the No-Minimum-Purchase Rule; and the Networks' so-called "anti-discrimination rules," which prohibit Merchants from treating any other Payment Card or medium more advantageously than the Defendants' cards. The Defendants' standard-form-Merchant agreements proscribe steering by preventing Merchants from establishing procedures that favor, discourage, or discriminate against the use of any particular Card.

e.      "Assessment" refers to an amount computed and charged by the Networks on each transaction amount to the Acquiring and Issuing Banks.

f.      "Authorization" is the process by which a Merchant determines

- 5 -

whether a cardholder is authorized by his or her Issuing Bank to make a particular transaction. The Merchant sends the cardholder's information to its Acquiring Bank or a Third-Party Processor, which sends it to Visa or MasterCard, which then sends it to the issuer or the issuer's processor, to obtain authorization. If authorization is given, the process is repeated in reverse.

g.  "Charge Card" or "Travel & Entertainment Card" (T&E) is an access device, usually a Payment Card, enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month. The issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of Charge Cards are the American Express Green, Gold, Platinum, and Centurion cards as well as the Diners Club and Carte Blanche cards issued by Citibank.

h.  "Credit Card" is an access device, usually a Payment Card, enabling the holder to (i) effect transactions on credit for goods and services purchased, which are paid on behalf of the holder by the issuer of such devices; or (ii) obtain cash with credit extended by the issuer. Credit Cards permit consumers to borrow the money for a retail purchase from the card issuer and to repay the debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuer. Examples of Credit Cards are the Visa and MasterCard Credit Cards issued by members of the Defendant Bank card networks, as well as the Discover and Private Issue cards issued by Morgan Stanley, Dean Witter & Co., and the Optima and Blue-type cards issued by American Express. Proprietary cards of individual Merchants for use only at particular Merchants' outlets are not included in this definition.

i.  "Debit Card" is an access device, usually a Payment Card, enabling the holder, among other things, to effect a cash withdrawal from the holder's depository bank account, either at an Automated Teller Machine ("ATM") or a point of sale.

j.  "Float" refers to the expense the Issuing Bank incurs by extending interest-free credit to the consumer for the Grace Period between the date of purchase and the date of payment.

k.  "General Purpose Cards" collectively refers to Credit Cards and Charge Cards.

- 6 -

l.      "Grace Period" refers to the time between a consumer's purchase and the date on which the consumer's payment is due to the Issuing Bank, during which time the consumer pays no interest.

m.     The "Honor All Cards" Rules are rules of the Visa and MasterCard Networks that require any Merchant that accepts Visa or MasterCard Credit Cards to accept all Credit Cards that are issued on that Network, and the rules of the Visa and MasterCard Networks that require any Merchant that accepts Visa or MasterCard Debit Cards to accept all Debit Cards that are issued on that Network.

n.      "Interchange Fee" in the United States General Purpose Card Network Services and Debit Card Network Services markets means a fee that Merchants pay to the Issuing Bank through the Network and the Acquiring Bank for each retail transaction in which the Issuer's card is used as a payment device at one of the Acquirer's Merchant accounts. The Interchange Fee is deducted by the Issuing Bank from amounts otherwise owed to Class Members on Payment Card transactions, and constitutes a component of and a floor for the Merchant-Discount Fee. The following example illustrates how the Visa and MasterCard Interchange Fees work. A customer presents a Visa or MasterCard card to a Merchant as a payment method. The Merchant contacts the Acquiring Bank, itself or through a Third-Party Processor, to authorize the transaction. The Acquiring Bank submits the transaction to the Network. The Network relays the transaction information to the Issuing Bank or the Issuing Bank's Third-Party Processor, which approves the transaction if the customer has a sufficient line of credit or available funds. If the transaction is authorized through the Network, the Issuing Bank pays the Acquiring Bank the payment amount minus the "Interchange Fee," which is fixed by the Member Banks of Visa and MasterCard. The Acquiring Bank then pays the Merchant the payment amount minus the Interchange Fee and other charges for processing the transaction. The total fee charged the Merchant is often referred to as the "Merchant-Discount Fee." The Interchange Fee is the largest component of the Merchant-Discount Fee. Visa Interchange Fees are fixed periodically by Visa Member Banks, acting through the Visa Board of Directors. MasterCard Interchange Fees are fixed periodically by the MasterCard Member Banks, acting through the MasterCard Board of Directors. "Merchant-Discount Fee" means the total amount that the Merchant, such as one of the Class members, pays to its Acquiring Bank for each transaction involving a Visa or MasterCard credit or Offline Debit Card.

o.      "Intra-Processed Transactions" are transactions in which the Issuing Bank and Acquiring Bank or Merchant processes transactions through the same Third-Party Processor.

- 7 -

p.      "Issuing Bank" or "Issuer" means a member of Visa and/or MasterCard that issues Visa and/or MasterCard branded Payment Cards to consumers for their use as payment systems and access devices. Issuing Banks compete with each other to issue Visa and MasterCard cards to consumers. Visa and MasterCard rules require that all Member Banks issue, respectively, Visa and MasterCard Payment Cards.

q.      "Merchant" means an individual, business, or other entity that accepts payments in exchange for goods or services rendered, as donations, or for any other reason.

r.      "Merchant-Discount Fee" is the total sum that is deducted from the amount of money a Merchant receives in the settlement of Visa and/or MasterCard transactions. The largest component of the Merchant-Discount Fee is the Interchange Fee.

s.      "Miscellaneous Exclusionary Restraints" refer collectively to the All-Outlets Rule, the No-Bypass Rule, and the No-Multi-Issuer Rule.

t.      "Network Services" means the services and infrastructure that Visa and MasterCard and their members provide to Merchants through which payment transactions are conducted, including authorization, clearance, and settlement of transactions, and those similar services offered by American Express and Discover. As they currently are offered by Visa and MasterCard and their Member Banks, Network Services include Network-Processing Services and the Visa and MasterCard Payment-Card Systems that facilitate acceptance of Visa and MasterCard Payment Cards by Merchants. "Network Services" are sometimes referred to as "Card Acceptance Services" as they relate to Merchants.

u.      "Network-Processing Services" are the services that are or may be used for authorizing, clearing, and settling Visa and MasterCard Credit and Debit Card transactions.

v.      "No-Minimum-Purchase Rule" is a rule of the Visa and MasterCard Networks that prohibits Merchants from imposing minimum-purchase amounts for Visa and MasterCard Credit-Card purchases.

w.      "No-Bypass Rule" is a rule of the Visa and MasterCard Networks that prohibits Merchants and Member Banks from bypassing the Visa or MasterCard system (thereby avoiding the supracompetitive Interchange Fees) in order to clear, authorize, or settle Credit Card transactions even if the Issuing and Acquiring Banks are the same, or even if a Third-Party Processor has agreements with both the Issuing and Acquiring Banks on any given transaction.

- 8 -

x. "No-Multi-Issuer Rule" is a rule of the Visa and MasterCard Networks respectively, that prohibits Visa and MasterCard transactions from also being able to be processed over other Networks.

y. "No-Surcharge Rule" is a rule of the Visa and MasterCard Networks that forbids Merchants from charging cardholders a surcharge on their Payment-Card transactions to reflect cost differences among various payment methods. For example, Merchants are prohibited from surcharging cardholders who use a Visa Credit Card rather than a Discover-branded Credit Card, or use a Premium Credit Card rather than a standard Credit Card, or use a Credit Card rather than another form of payment.

z. "Offline Signature Debit Card" or "Offline Debit Card" is a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the POS and signing a receipt. Offline Signature Debit Card transactions are processed as Credit Card transactions. Examples of Offline Signature Debit Cards include Visa's "Visa Check" product and MasterCard's "Debit MasterCard" product.

aa. "Online PIN-Debit Card" or "PIN-Debit Card" is a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping her card at the POS and entering a Personal Identification Number ("PIN"). PIN-Debit Card networks grew out of regional ATM networks and are therefore processed differently than Offline transactions. Examples of Online PIN-Debit Card networks include Interlink, Maestro, NYCE, and Pulse.

bb. A "Premium Card" is a General Purpose Card that carries a higher Interchange Fee than a Standard Card and is required by a network to carry a certain level of rewards or incentives to the cardholder. Visa's "Signature" and "Traditional Rewards" card products and MasterCard's "World" card product are examples of Premium Cards.

cc. "On-Us Transactions" are transactions in which the Acquiring Bank and the Issuing Bank are the same. Even when the Issuing and Acquiring Banks are identical, Visa and MasterCard require that the Issuing Bank charge an Interchange Fee to the Merchant.

dd. "Payment Card" refers to a plastic card that enables consumers to make purchases from Merchants that accept the consumer's Payment Card. The term "Payment Card" refers to several different types of cards, including, General-Purpose Cards, Debit Cards, Travel & Entertainment Cards, stored-value cards, and Merchant-proprietary cards.

- 9 -

ee.  Although "Payment Cards" are a subset of "Access Devices," the two terms are used interchangeably herein, because despite evolving technology, Payment Cards continue to constitute the vast majority of Access Devices.

ff.  "Payment-Card-System Services" means the standard-setting functions performed by Payment-Card Networks.  Payment-Card-System Services encompasses the brand of the particular card program, the rules and protocols for providing Merchant acceptance of and conducting Payment-Card transactions under that brand, and the rules and protocols for conducting transactions under that brand.  The four leading providers of Payment-Card-System Services are Visa, MasterCard, Discover, and American Express.

gg.  "Payment-Guarantee Services" refers to a service that a Merchant might purchase to insure the Merchant against Credit or Debit Card fraud, check fraud, and other forms of payment fraud, and/or assists the Merchant in minimizing the costs of such fraud.

hh.  "Relevant Markets" include markets no broader than the markets for General Purpose Cards, General Purpose Card Network Services, Offline Debit Cards, Offline Debit Card Network Services, PIN-Debit Cards, and PIN-Debit Card Network Services, as they are defined and described in ¶¶ 271-291, 358-370, and 398-408.

ii.  "Settlement" is the process by which the Merchant is reimbursed for a Payment Card transaction.  While Visa and MasterCard rules require that an Acquiring Bank be a party to all Merchant card-acceptance agreements, Merchants often use Third-Party Processors to process these transactions.  The Acquiring Bank or its processor credits the Merchant's bank account with the amount paid by the cardholder less the Merchant-Discount fee, the largest component of which is the Interchange Fee, and then transmits the transaction data to Visa or MasterCard, which sends it to the Issuing Bank or its Third-Party Processor.  The Issuing Bank then sends payment to the Acquiring Bank through Visa or MasterCard (and possibly the Acquirer's processor).  In a Credit Card or Offline Debit Card transaction, settlement occurs two to four days after authorization and clearing.  In a PIN-Debit transaction, all three processes occur in the same electronic transaction virtually instantaneously.

jj.  "Third-Party Processor" is a firm, other than Visa, MasterCard, a Member Bank, or an entity affiliated with a Member Bank, that performs the authorization, clearing, and settlement functions of a Visa or MasterCard Payment-Card transaction on behalf of a Merchant or a Member Bank.  Examples of Third-Party Processors include First Data and Transfirst.

- 10 -

# IV.

## THE PARTIES

9.     Plaintiff Photos Etc. Corporation ("Photos Etc.") is a California corporation doing business as "30 Minute Photos Etc." with its principal place of business in Irvine, California. Photos Etc. is engaged in the business of photography finishing, which includes the operation of a national internet-based photography business.   Photos Etc. accepts payment by Visa and MasterCard Credit and Debit Cards.   Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Photos Etc. and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices.  Photos Etc. has been injured in its business or property as a result of the unlawful conduct alleged herein.

10.     Plaintiff Traditions Ltd. is a Minnesota corporation which owns and operates retail furniture stores in St. Paul and Minneapolis, Minnesota and Naples, Florida.  Traditions Ltd. accepts payment by Visa and MasterCard Credit and Debit Cards.   Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Traditions Ltd. and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices.   Traditions Ltd. has been injured in its business or property as a result of the unlawful conduct alleged herein.

11.     Plaintiff Capital Audio Electronics Inc. ("Capital Audio") is a wholesale and retail consumer electronics company, with its principal place of business in New York, New York. Capital Audio accepts payment by Visa and MasterCard Credit and Debit Cards.  Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Capital Audio and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices.  Capital Audio

- 11 -

has been injured in its business or property as a result of the unlawful conduct alleged herein.

12.     Plaintiff CHS Inc. ("CHS") is a Minnesota cooperative corporation with its principal place of business in Inver Grove Heights, Minnesota.  CHS is an agricultural cooperative that, among its many activities, does the following:  (i) owns farm stores, gas stations and convenience stores (the "Owned Stores") and (ii) provides products, supplies and services to other persons and entities that own gas stations and convenience stores (the "Non-Owned Stores").  CHS accepts Visa and MasterCard Credit and Debit Cards on behalf of both the Owned Stores and the Non-Owned Stores.  Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with Visa and MasterCard transactions on CHS and force them to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices.  CHS has been injured in its business or property as a result of the unlawful conduct alleged herein.

13.     Plaintiff Coborn's, Incorporated ("Coborn's") is a Minnesota corporation with its principal place of business in St. Cloud, Minnesota.  Coborn's accepts payment by Visa and MasterCard Credit and Debit Cards.   Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Coborn's and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices.  Coborn's has been injured in its business or property as a result of the unlawful conduct alleged herein.

14.     Plaintiff Crystal Rock, LLC ("Crystal Rock") is a Delaware limited-liability company with its principal place of business in Watertown, Connecticut.  Crystal Rock markets and distributes natural spring water as well as coffee and other ancillary products to homes and offices throughout New England, New York, and New Jersey.  Crystal Rock is the fourth-largest home- and office water-distribution company in the United States.  Crystal Rock accepts payment by Visa

- 12 -

and MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Crystal Rock and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Crystal Rock has been injured in its business or property as a result of the unlawful conduct alleged herein.

15.     Plaintiff D'Agostino Supermarkets, Inc. ("D'Agostino") is a family-owned retail grocery chain operating under the laws of New York with its principal place of business is Larchmont, New York. D'Agostino has 18 locations in and around New York City. D'Agostino accepts payment by Visa and MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on D'Agostino and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. D'Agostino has been injured in its business or property as a result of the unlawful conduct alleged herein.

16.     Plaintiff Discount Optics, Inc. ("Discount Optics") is a Florida corporation with its principal place of business in Boca Raton, Florida. Discount Optics is in the business of wholesale optical supplies for the optical industry. Discount Optics accepts payment by Visa and MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Discount Optics and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Discount Optics has been injured in its business or property as a result of the unlawful conduct alleged herein.

17.     Plaintiff Jetro Cash & Carry Enterprises, LLC, a Delaware limited liability company with its principal place of business in College Point, New York, is a subsidiary of Jetro Holdings,

- 13 -

Inc. On June 1, 2008, Jetro Holdings, Inc. became a Delaware limited liability company with its principal place of business in College Point, New York. Jetro Cash & Carry Enterprises, Inc. and Jetro Holdings, Inc. are collectively referred to herein as "Jetro."

18. Jetro engages in interstate commerce. It operates 67 warehouse-style stores under the names "Jetro Cash & Carry" and "Restaurant Depot." Through these wholesale outlets, Jetro is the nation's largest cash-and-carry supplier of food and equipment to independent grocery stores and restaurants. Jetro accepts payment by Visa and MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Jetro and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Jetro has been injured in its business or property as a result of the unlawful conduct alleged herein.

19. Plaintiff Leon's Transmission Service, Inc. ("Leon's Transmission") is a California corporation with its principal place of business in Reseda, California. Leon's Transmission is an automotive transmission service serving Southern California. Leon's Transmission accepts payment by Visa and MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Leon's Transmission and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Leon's Transmission has been injured in its business or property as a result of the unlawful conduct alleged herein.

20. Plaintiff Parkway Corporation ("Parkway") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. Parkway is engaged in the automobile-parking business. Parkway accepts payment by Visa and MasterCard Credit and Debit Cards.

- 14 -

Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Parkway and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Parkway has been injured in its business or property as a result of the unlawful conduct alleged herein.

21.     Plaintiff Payless ShoeSource, Inc., ("Payless") is a Delaware Corporation with its principal place of business in Topeka, Kansas. Payless accepts payment by Visa and MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Payless and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Payless has been injured in its business or property as a result of the unlawful conduct alleged herein.

22.     Plaintiff Affiliated Foods Midwest Cooperative, Inc. ("AFMW") is a Nebraska corporation with its principal place of business in Norfolk, Nebraska. AFMW is a cooperative owned by or serving over 800 independent supermarkets in 12 Midwestern states. AFMW's primary business is a supply warehouse and service provider for its retail-grocer members.

23.     Most of the retailer-owners and retailer-members of AFMW accept payment by Visa and/or MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on AFMW retail members and owners, and force them to abide by Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. AFMW retail members and owners that accept Visa and/or MasterCard Credit and Debit Cards have been injured in their business or property.

- 15 -

24.     Plaintiff National Association of Convenience Stores ("NACS") is a non-profit international trade association organized under the laws of Virginia, with its principal place of business in Alexandria, Virginia.

25.     NACS represents more than 2,000 convenience store companies, operating more than 146,000 locations in the United States and more than 250,000 locations worldwide. NACS members have combined revenues of more than 577 billion dollars annually. Some of NACS's members are located in the Eastern District of New York.

26.     Most of the convenience stores represented by NACS accept payment by Visa and/or MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on NACS members and force them to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices.

27.     NACS funds its operations partly with dues and payments from its members. NACS accepts payment for these services by Visa and MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on NACS and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. NACS and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

28.     NACS seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

29.     Plaintiff NATSO, Inc. ("NATSO") is a non-profit trade association, organized under

- 16 -

the laws of Virginia, with its principal place of business in Alexandria, Virginia. NATSO represents travel plaza and truck stop owners and operators. NATSO represents more than 900 travel plazas and truck stops nationwide, owned by more than 260 corporate entities. NATSO's mission is to advance this diverse industry by serving as the official source of information on travel plazas, acting as the voice of the industry with government, and conducting the industry's only national convention and exposition.

30. NATSO, and most of the truck stops and travel plazas it represents, accept payment by Visa and MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on NATSO and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. NATSO and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

31. NATSO seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

32. Plaintiff National Community Pharmacists Association ("NCPA") is a non-profit trade association operating under the laws of Virginia with its principal place of business in Alexandria, Virginia.

33. NCPA represents the pharmacist owners, managers, and employees of nearly 25,000 independent community pharmacies across the United States. Some of NCPA's members are located in the Eastern District of New York.

34. Most of the pharmacies and pharmacists represented by NCPA accept payment by Visa and/or MasterCard Credit and Debit Cards. Accordingly, Defendants impose

- 17 -

supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on NCPA and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. NCPA and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

35. NCPA funds its operations partly with dues from its members. It allows its members to pay dues with Visa and MasterCard Credit and Debit Cards, for which NCPA pays the supracompetitive Interchange and Merchant-Discount Fees associated with those Credit Card dues payments.

36. NCPA seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

37. Plaintiff National Cooperative Grocers Association ("NCGA") is a Minnesota cooperative with its principal place of business in Iowa City, Iowa and acts as a trade association and national purchasing cooperative for consumer-owned grocery stores.

38. NCGA represents the interests of 110 member-owned cooperatives, which operate 136 storefronts in 32 states across the nation, with combined annual sales of over 945 million dollars. NCGA's mission is to provide the vision, leadership, and systems necessary to support a nationwide network of cooperatives.

39. Most of the cooperative retailers represented by NCGA accept payment by Visa and/or MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on NCGA and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. NCGA and its members have been injured in its business or

property as a result of the unlawful conduct alleged herein.

40. NCGA seeks declaratory and injunctive relief on behalf of itself and its members as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

41. Plaintiff National Grocers Association ("N.G.A.") is a non-profit international trade association, organized under the laws of the District of Columbia with its principal place of business in Arlington, Virginia.

42. N.G.A. represents and serves the retail grocery/food companies and wholesale distributors that comprise the independent sector of the food-distribution industry. N.G.A. members include retail-grocery/food companies and wholesale distributors, affiliated associations, as well as manufacturers, service suppliers, and other entrepreneurial companies that support N.G.A.'s Philosophy and Mission. Some of N.G.A.'s members are located in the Eastern District of New York.

43. N.G.A. and most of the retailers and wholesalers represented directly or indirectly by it accept payment by Visa and/or MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on N.G.A. and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. N.G.A. and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

44. N.G.A. seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

45. Plaintiff National Restaurant Association ("NRA") is a non-profit trade association,

- 19 -

organized under the laws of the State of Illinois, with its principal place of business in Washington, D.C. Founded in 1919, NRA is the leading national business trade association for the restaurant industry. The Association's mission is to represent, educate, and promote a rapidly growing industry that is comprised of 945,000 restaurant and foodservice outlets employing 13.1 million people.

46. NRA, and many of its members, accept payment by Visa and/or MasterCard Credit and Debit Cards. Accordingly, Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on NRA and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. NRA and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

47. NRA seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

48. The anticompetitive behavior by the Visa and MasterCard Networks and their Member Banks has caused antitrust injury common to the Plaintiffs and Class Members.

49. Until the Visa corporate restructuring described below at paragraphs 268 and 269, Defendant Visa International (f/k/a Visa International Service Association) was a non-stock, non-assessable Delaware membership corporation with its principal place of business in Foster City, California. Its members included approximately 21,000 banks.

50. Until the Visa corporate restructuring described below at paragraphs 268 and 269, Defendant Visa U.S.A., Inc. was a group-member of Visa International Service Association and was also a non-stock, non-assessable Delaware membership corporation with its principal place of

- 20 -

business in San Francisco, California. It was a national bank-card association whose members included approximately 14,000 banks. Defendants Visa International Service Association, Visa U.S.A., Inc., and Visa, Inc. are collectively referred to herein as "Visa." During the relevant time period and until the Visa corporate re-structuring described below at paragraphs 269 and 270, Visa was governed by a board of directors comprised of bank executives selected from its Member Banks, including some of the Bank Defendants. Visa transacts business in this judicial district.

51. Visa conducted a number of corporate-restructuring maneuvers in 2007 and 2008 to combine several previously independent entities into Visa, Inc. On March 19, 2008, Visa, Inc. conducted an initial public offering, by which, similar to MasterCard, Visa attempted to turn itself from a joint venture subject to scrutiny under Section 1 of the Sherman Act, to a "single entity" supposedly incapable of "conspiring" within the meaning of section 1 when it sets a uniform schedule of default Interchange Fees. The company that resulted ("New Visa") is a publicly-traded Delaware Corporation known as Visa, Inc. with its principal place of business in San Francisco, California. Visa, Inc. is hereby made a Defendant in this action.

52. Before the MasterCard corporate restructuring described below at paragraphs 265-268, Defendant MasterCard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York. Defendant MasterCard International Incorporated is a Delaware membership corporation that consists of more than 23,000 Member Banks worldwide and is the principal operating subsidiary of MasterCard Incorporated. MasterCard Incorporated and MasterCard International Incorporated are collectively referred to herein as "MasterCard."

53. On May 25, 2006, MasterCard conducted an Initial Public Offering and entered into several related agreements, in an attempt to turn itself from a joint venture subject to scrutiny under

Section 1 of the Sherman Act, to a "single entity" supposedly incapable of "conspiring" within the meaning of section 1 when establishing uniform schedules of default Interchange Fees. The resulting entity ("New MasterCard") is a publicly-traded Delaware corporation with its principal place of business in Purchase, NY.

54. Defendant Bank of America, N.A. is a national banking association with its principal place of business in Charlotte, North Carolina. Defendant BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.) is an Ohio corporation with its principal place of business in Louisville, Kentucky, and is a wholly owned subsidiary of Defendant Bank of America, N.A., which in turn is a wholly owned subsidiary of NB Holdings, which in turn is wholly owned by Defendant Bank of America Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina. Defendant Bank of America, N.A., Defendant BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), and NB Holdings and Bank of America Corporation are collectively referred to as "Bank of America."

55. Bank of America is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2005 it was represented on the Visa U.S.A. Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It is currently and/or has been represented on the Visa Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

56. Defendant MBNA America Bank, N.A. ("MBNA") is a Delaware corporation with its principal place of business in Wilmington, Delaware and a wholly-owned subsidiary of MBNA Corporation, a Maryland corporation with its principal place of business in Wilmington, Delaware.

57.     MBNA is a member of both Visa and MasterCard.  It engages in interstate commerce.  Between 2000 and 2006 it was represented on the MasterCard Board of Directors for the U.S. Regions.  It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses.  It is currently and/or has been represented on the Board of Directors of MasterCard.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

58.     On January 1, 2006, Defendant Bank of America acquired 100 percent of the stock of MBNA.  For all actions from and after that date, Defendants MBNA and Bank of America are referred to collectively as "Bank of America."

59.     Defendant Barclays Bank plc is a bank operating under the laws of the United Kingdom with its principal place of business in London, England.  Between at least 2000 and 2005, it was represented on the Visa International Board of Directors.  During that period, the Visa International Board had authority to adopt, and did adopt, schedules of Interchange Fees.  From time to time the Visa International Board would delegate to Visa Regional Boards, including the Visa U.S.A. Board, the actual adoption of schedules of Interchange Fees.  Defendant Barclays Financial Corp., f/k/a Juniper Financial Corporation, a Delaware corporation with its principal place of business in Wilmington, Delaware, is a wholly-owned subsidiary of Defendant Barclays Bank plc.  Defendant Barclays Bank Delaware, f/k/a Juniper Bank, is a subsidiary of Defendant Barclays Financial Corp. Defendants Barclays Bank plc, Barclays Financial Corp., and Barclays Bank Delaware are collectively referred to herein as "Barclays."

60.     Barclays is a member of both Visa and MasterCard through Barclays Financial Corporation and issues credit cards through its Barclaycard division.  It engages in interstate commerce.  It has had actual knowledge of, and has knowingly participated in, the conspiracies

- 23 -

alleged in this Complaint.

61. Defendant Capital One Bank, (USA), N.A., a Virginia bank with its principal place of business in Glen Allen, Virginia, and Capital One F.S.B., Capital One, N.A., a national bank with its principal place of business in McLean, Virginia, are wholly-owned subsidiaries of Defendant Capital One Financial Corporation, a Delaware corporation with its principal place of business in McLean, Virginia. Defendants Capital One Bank, Capital One F.S.B., and Capital One Financial Corporation are collectively referred to as "Capital One." On July 1, 2007, named defendant Capital One F.S.B. merged into Defendant Capital One, N.A. and ceased to exist as a legal entity.

62. Capital One is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2006, it was represented on the MasterCard Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

63. Defendant Chase Bank USA, N.A., a New York bank with its principal place of business in New York, New York, is the successor to Chase Manhattan Bank USA, N.A., and a wholly owned subsidiary of Defendant JPMorgan Chase & Co., a Delaware corporation with its principal place of business in New York, New York. Defendant Chase Paymentech Solutions, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in Dallas, Texas. Defendant JP Morgan Chase & Co. is the majority parent of Defendant Chase Paymentech Solutions, LLC. Defendants Chase Bank USA, N.A., Chase Paymentech Solutions, LLC, and JP Morgan Chase & Co. are collectively referred to herein as "Chase." Chase is

- 24 -

a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that issues Payment Cards to individuals and businesses throughout this judicial district. Between 2000 and 2003, Chase was represented on the MasterCard Board of Directors for the United States. Between 2003 and 2006, it was represented on the Visa U.S.A. Board of Directors. Chase is currently represented on the Board of Directors of Defendant Visa, Inc. Through Defendant Chase Paymentech Solutions, LLC, it is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.

64.     In July, 2004, Chase completed its acquisition of Bank One Corporation and Bank One Delaware, N.A., which also had acted as Issuing Bank and an Acquiring Bank. Before the acquisition, Bank One Corporation had actual knowledge of and knowingly participated in the conspiracies alleged in this Complaint. From at least 2000 until its acquisition by Chase, Bank One was represented on the Visa U.S.A. Board of Directors.

65.     As described in paragraph 87 below, Defendant JPMorgan Chase Bank, N.A., a nationally chartered bank operating under the laws of Ohio with its primary place of business in Columbus, Ohio acquired the Credit-Card operations and receivables of Defendant Washington Mutual Bank from the FDIC on September 25, 2008. By acquiring these assets, JPMorgan Chase Bank, N.A. became the successor in interest to the liabilities that are associated with this litigation.

66.     Defendant Citibank (South Dakota), N.A. is a South Dakota bank with its principal place of business in Sioux Falls, South Dakota.  It is identified in Citigroup's 2007 10-K filing as Citigroup's "primary banking entity responsible for U.S. credit card activities."  Until 2006, Defendant Citibank (South Dakota), N.A. was a direct subsidiary of Citibank, N.A.  In 2006 Defendant Citibank, N.A. transferred its investment in Defendant Citibank (South Dakota), N.A. to Defendant Citigroup, Inc.

- 25 -

67.     Defendant Citibank N.A., is a bank with its principal place of business in New York, New York, is a subsidiary of Defendant Citigroup, Inc., a Delaware corporation with its principal place of business in New York, New York.  Defendant Citicorp merged into Defendant Citigroup, Inc., on August 1, 2005.  Defendants Citibank N.A., Citicorp, and Citigroup, Inc. are collectively referred to herein as "Citigroup."

68.     Citigroup is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses.  It is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.  It has been and remains represented on the MasterCard, Inc. Board of Directors.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

69.     Defendant Fifth Third Bancorp ("Fifth Third") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

70.     Fifth Third is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses.  From at least 2005 to 2006, Fifth Third was represented on the MasterCard Board of Directors.  It is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

71.     Defendant First National Bank of Omaha is a subsidiary of First National Bank of Nebraska which is a Nebraska corporation with its principal place of business in Omaha, Nebraska.

72.     First National Bank of Omaha is a member of both Visa and MasterCard.  It engages in interstate commerce.  Between 2000 and 2006, First National Bank of Omaha or First National

- 26 -

Bank of Nebraska was represented on the Visa Board of Directors.  It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses.  It is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

73.     Defendant HSBC Finance Corporation is a Delaware corporation with its principal place of business in Mettawa, Illinois.  It is an indirectly-held, wholly-owned subsidiary of Defendant HSBC North America Holdings, Inc., which is wholly owned by Defendant HSBC Holdings, plc, a corporation organized under the laws of the United Kingdom with its principal place of business in London, England.  Defendant HSBC Bank USA, N.A., is a national bank with its principal place of business in New York, NY.  Defendant HSBC Bank USA, N.A., is a subsidiary of HSBC USA Inc., which is an indirectly-held, wholly–owned subsidiary of Defendant HSBC North America Holdings, Inc.  Defendant HSBC Bank plc is a United Kingdom corporation with its principal place of business in London, England and is a wholly-owned subsidiary of HSBC Holdings plc.  Defendant HSBC Finance Corporation, HSBC Bank USA, N.A., HSBC North America Holdings, Inc., Defendant HSBC Bank plc, and HSBC Holdings, plc, are collectively referred to herein as "HSBC."

74.     HSBC is a member of both Visa and MasterCard.  HSBC engages in interstate commerce.  HSBC is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses.  Through HSBC Bank USA, N.A., and HSBC Bank, plc, HSBC is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.  Through HSBC Bank plc, HSBC is the third-party processor of all PayPal Inc. transactions acquired by HSBC Bank USA, N.A., in the United States.  It is currently and/or has

- 27 -

been represented on the MasterCard Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

75. HSBC and its constituent entities have been represented on MasterCard Boards of Directors throughout the relevant time period. For example, from 2005 to 2006, HSBC North America Holdings, Inc. was represented on the MasterCard Global Board of Directors. From 2000 to 2005 Household International was represented on the U.S. Board of Directors for MasterCard. Between 2000 and 2005, HSBC Bank, plc was represented on the MasterCard Global Board of Directors.

76. Defendant National City Corporation is a Delaware Corporation with its principal place of business in Cleveland, Ohio. Defendant National City Bank of Kentucky was a wholly-owned subsidiary of Defendant National City Corporation until 2007, when it was merged into Defendant National City Bank of Kentucky. Defendants National City Corporation and National City Bank of Kentucky are collectively referred to herein as "National City."

77. National City is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2003 and 2006, it was represented on the Visa Board of Directors. It was represented on the Visa International Board of Directors in at least 2005. It is an Issuing Bank. National City was an Acquiring Bank through its former subsidiary, Defendant National Processing, Inc. (n/k/a BA Merchant Services LLC), until National Processing, Inc. (n/k/a BA Merchant Services LLC) was purchased by Bank of America in October 2004. Until then, National City was an Acquiring Bank that, throughout this judicial district, provided card-acceptance services to Class Members. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

78. On October 24, 2008, PNC Financial Services Group, Inc. executed a stock-for-

- 28 -

stock acquisition of National City Corporation, which was supported by the Troubled Asset Relief Program's Capital Purchase Program. PNC has stated that it intends to finalize the acquisition by December 31, 2008, at which time National City and its banking affiliates will be merged into PNC and assume the PNC name. As part of this acquisition, PNC will assume the payment-card related assets and liabilities of National City, including the liability to the Class in this action.

79.    Defendant SunTrust Banks, Inc. ("SunTrust") is a Georgia corporation with its principal place of business in Atlanta, Georgia.  Defendant SunTrust Bank is a bank operating under the laws of Georgia with it principal place of business in Atlanta, Georgia.

80.    SunTrust is a member of both Visa and MasterCard.  It engages in interstate commerce.  Between 2000 and 2006 it was represented on the Visa U.S.A. Board of Directors. Through its subsidiary, Defendant SunTrust Bank, is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses.  It is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

81.    Defendant Texas Independent Bancshares, Inc. is a Texas corporation with its principal place of business in Texas City, Texas.

82.    Texas Independent Bancshares, Inc. is a member of Visa and MasterCard.  It engages in interstate commerce.  Between 2000 and 2006 it was  represented on the Visa U.S.A. Board of Directors.  Between at least 2000 and 2002, and 2004 and 2005, it was also represented on the Visa International Board of Directors.  It is currently represented on the Board of Directors of Visa, Inc.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

83.    Defendant Wachovia Bank, N.A., a North Carolina corporation with its principal

- 29 -

place of business in Charlotte, North Carolina, is a subsidiary of Defendant Wachovia Corporation, a North Carolina corporation with its principal place of business in Charlotte, North Carolina. Defendants Wachovia Bank, N.A. and Wachovia Corporation are collectively referred to herein as "Wachovia."

84.     Wachovia is a member of both Visa and MasterCard.  It engages in interstate commerce.  Between 2002 and 2006, it was represented on the Visa U.S.A. Board of Directors.  It is an Issuing bank that, throughout this judicial district, issues Payment Cards to individuals and businesses.  It is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

85.     On September 29, 2008, in what was phrased as an effort to help Wachovia avoid receivership by the Federal Deposit Insurance Corporation ("FDIC"), Defendant Citigroup executed a preliminary agreement to purchase Wachovia's bank assets. On October 3, 2008, however, Defendant Wells Fargo signed a definitive agreement to acquire all of Wachovia's operations. Citigroup, Wachovia, and Wells Fargo are engaged in litigation in state court in New York and federal court in North Carolina, regarding which of the two competing purchase offers is valid. Under the Wells Fargo agreement, Wells Fargo acquires Wachovia's assets and liabilities, including its payment-card operations and associated liabilities, through a stock-for-stock transaction. Under this agreement, Wells Fargo is the parent corporation of Wachovia and has assumed all of Wachovia's liabilities relating to this action.

86.     Defendants Washington Mutual Bank and Washington Mutual, Inc., were Washington corporations with their principal places of business in Seattle, Washington. Washington Mutual Bank and Washington Mutual, Inc. engage in interstate commerce.  On

- 30 -

October 3, 2005, Washington Mutual, Inc. completed its acquisition of Defendant Providian National Bank. From that date forward, Defendants Washington Mutual, Inc. and Providian National Bank are collectively referred to as "Washington Mutual." Between 2002 and 2005 Providian was represented on the Visa U.S.A. Board of Directors. From 2005 to 2006 Washington Mutual was represented on the Visa U.S.A. Board of Directors.

87.     Through its acquisition of Providian National Bank, Washington Mutual is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

88.     On September 25, 2008, the Office of Thrift Supervision placed Washington Mutual Bank into receivership, with the FDIC as receiver. The deposits, assets, and certain liabilities of Washington Mutual Bank were then acquired that same day by Defendant JP Morgan Chase & Co. On September 26, 2008, Defendant Washington Mutual, Inc. filed for bankruptcy in the District of Delaware.

89.     Defendant Providian National Bank, a national banking association with its principal place of business in Tilton, New Hampshire, was a wholly-owned subsidiary of Defendant Providian Financial Corporation, a Delaware corporation with its principal place of business in San Francisco, California. On October 1, 2005, Defendant Providian National Bank was acquired by Washington Mutual and was renamed Washington Mutual Card Services, Inc. Washington Mutual Card Services, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

90.     Providian is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that, throughout this judicial district, issues General Purpose

- 31 -

Payment Cards to individuals and businesses. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

91.     Defendant Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with its principal place of business in San Francisco, California.

92.     Wells Fargo is a member of both Visa and MasterCard. It engages in interstate commerce. During parts of the relevant time period, it was represented on the Visa U.S.A. Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses. Through its "Wells Fargo Merchant Services" division, it is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint. Upon completion of the transaction described in Paragraph 85 above, Wells Fargo will become the parent corporation of Defendant Wachovia.

93.     Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, MBNA America Bank, N.A., Barclays Bank plc, Barclays Bank Delaware, Barclays Financial Corp., Capital One Bank, (USA), N.A., Capital One F.S.B., Capital One Financial Corporation, Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Bank One Corporation, Bank One Delaware, Citibank (South Dakota), N.A., Citibank N.A., Citigroup, Inc., Citicorp, Fifth Third Bancorp, First National Bank of Omaha, HSBC Finance Corporation, HSBC Bank USA, N.A., HSBC North American Holdings, Inc., HSBC Holdings, plc, HSBC Bank, plc, National City Corporation, National City Bank of Kentucky, SunTrust Banks, Inc., SunTrust Bank, Texas Independent Bancshares, Inc., Wachovia Bank, N.A., Wachovia Corporation, Washington Mutual, Inc., Washington Mutual Bank, Providian

National Bank (n/k/a Washington Mutual Card Services, Inc.), Providian Financial Corporation, and Wells Fargo & Company, (collectively "Bank Defendants"), are Member Banks of the Visa and MasterCard networks. The Bank Defendants are actual or potential competitors for the issuance of Credit Cards and acquisition of Merchants. All of the Bank Defendants belong to both networks and have conspired with each other and with the Visa and MasterCard Associations to fix the level of Interchange Fees that they charge to Merchants.

94.     Many of the Bank Defendants are, or were during the relevant period, represented on the Visa and/or MasterCard Boards of Directors at the times when those Boards collectively fixed uniform Interchange Fees and imposed the anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary Restraints, tying and bundling arrangements, and exclusive-dealing. The Bank Defendants delegated to the Visa and MasterCard Boards of Directors the authority to take those actions. Each of the Bank Defendants had actual knowledge of, participated in, and consciously committed itself to the conspiracies alleged herein.

95.     Before Visa's IPO, Section 5.01(a) of the Bylaws of Visa U.S.A. (May 15, 2004) limited seats on its Board of Directors to (i) "officers of [Visa U.S.A.]," (ii) "officers of Charter Members [with some exceptions]...having at least the equivalent rank of Chief Executive Officer or Chief Administrative Officer, or [for larger Member Banks] a person who in their performance of his regular duties reports to such an officer." Individuals who "previously held the title of Chairman, Vice Chairman, or Chief Executive Officer of a Charter Member were allowed to hold the post of "Second Special Director At Large" or "Third Special Director At Large for Technology," provided that the latter is "well qualified in systems and technology issues of importance to [Visa U.S.A.'s] Payment Services." Even after the IPO, representatives of Member Banks maintain substantial representation on the Board of Visa, Inc.

- 33 -

96.     Similarly, prior to MasterCard's IPO, Article IV-1 of its Bylaws required that each Director "be an officer of a member institution of MasterCard International Incorporated or an individual otherwise uniquely qualified to provide guidance as to the Corporation's affairs." Even after the IPO, the Member Banks retain substantial representation on Board of New MasterCard.

97.     Bank Defendants are therefore directly responsible for collectively fixing Interchange Fees within each Network and between the two Networks.  Bank Defendants, acting by and through the Boards of Directors of Visa and MasterCard, are also directly responsible for the tying and bundling of separate and distinct services together in those Interchange Fees, the imposition of the Anti-Steering Restraints and engaging in the other anticompetitive conduct alleged herein.  Collectively, the Bank Defendants, through their operation of Visa and MasterCard, adopted and approved the above-mentioned policies and have significantly profited from those policies.

98.     Even after the corporate restructuring of the Visa and MasterCard Networks, the banks continue to conspire to fix Interchange Fees.  Each of the Bank Defendants belongs to Visa and MasterCard and has agreed that Visa and MasterCard may apply uniform schedules of default Interchange Fees to their Payment Card businesses.

99.     ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

- 34 -

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████.

100.    Acquiring banks enter into acceptance contracts with Merchants agreeing either implicitly or explicitly that the Networks' uniform schedule of Interchange Fees will apply to all of the Merchant's transactions that are initiated by Visa or MasterCard Payment Cards. These Acquiring Banks understand that the same uniform schedule of Interchange Fees will be applied to transactions conducted by all other Acquiring Banks for those banks' Merchant customers. Issuing Banks enter into issuing contracts with the Networks, agreeing and understanding that they will receive Interchange Fees from Merchants based upon the Networks' uniform schedule of Interchange Fees.

## V.

## <u>CO-CONSPIRATORS</u>

101.    The Second Circuit noted that Visa and MasterCard "are not single entities; they are consortiums of competitors." Before the corporate restructuring described below, they were "owned and effectively operated by over 22,000 banks, which compete with one another in the issuance of Payment Cards and the acquiring of Merchants' transactions." *United States v. Visa*, 344 F.3d 229, 242 (2d Cir. 2003). Because of this judgment, among other things, the Networks and their Member Banks recognized that the Networks were "structural conspiracies" and "walking conspiracies."

102.    Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Co-conspirators include, but are not limited

to, the following: (a) Issuing Banks that have issued Visa and/or MasterCard Credit and Debit Cards and have agreed to charge uniform, collectively fixed Visa and MasterCard Interchange Fees for various Merchants and transactions; (b) certain banks that are or were members of the Boards of Directors of Visa or MasterCard and adopted and agreed to fix Interchange Fees for various Merchants and transactions and to impose the anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary Restraints alleged herein; and (c) Acquiring Banks that acquire Visa and MasterCard transactions from Class Members, as described herein, and that have participated in the conspiracy to collectively fix Interchange Fees.

103.    Defendants impose, and have imposed, supracompetitive Interchange Fees on  Class Members as further described herein.

104.    Before the corporate restructuring of the Visa and MasterCard networks described below, the Member Banks of Visa and MasterCard, acting through Visa and MasterCard, set uniform schedules of Interchange Fees for transactions conducted over Visa and MasterCard Networks.  The Bank Defendants have had actual knowledge of, and have knowingly participated in, the conspiracy to collectively fix uniform schedules of Credit and Debit Card Interchange Fees, and impose upon all Class Members the anticompetitive Anti-Steering Restraints.

## VI.

## <u>TRADE AND INTERSTATE COMMERCE</u>

105.    The trade and interstate commerce relevant to this action is General Purpose Card Network Services, Offline Debit Card Network Services and PIN-Debit Card Network Services.

106.    During all or part of the Class Period, each of the Defendants, directly or through their affiliates or subsidiaries, participated in the markets for General Purpose Card Network Services, Offline Debit Card Network Services or PIN-Debit Card Network Services in a

continuous and uninterrupted flow of interstate commerce.

107.   The activities of Defendants and their co-conspirators, as described herein, were within the flow of and had a substantial effect on interstate commerce.

## VII.

## CLASS ACTION ALLEGATIONS

108.   Plaintiffs seek to represent two classes (collectively the "Class Members") under Rule 23(b)(1), (2) and (3), Fed. R. Civ. P., for violations of 15 U.S.C. §§ 1 & 2, and Cal. Bus. & Prof. Code § 16700 *et seq.*

a.   The first class, "Class I," seeks damages only for violations of 15 U.S.C. § 1, and Cal. Bus. & Prof. Code § 16700 *et seq.* and is defined as:

All persons, businesses, and other entities, that have accepted Visa and/or MasterCard Credit and/or Debit Cards in the United States at any time from and after January 1, 2004.  This Class does not include the named Defendants, their directors, officers, or members of their families, or their co-conspirators or the United States Government.

b.   The second class, "Class II," seeks declaratory and injunctive relief only for violations of 15 U.S.C. §§ 1 & 2, and Cal. Bus. & Prof. Code § 16700 *et seq.* and is defined as:

All persons, businesses and other entities that currently accept Visa and/or MasterCard Credit and/or Debit Cards in the United States or the United States Government.  This Class does not include the named Defendants, their directors, officers, or members of their families, or their co-conspirators.

109.   Plaintiffs Photos Etc., Traditions, Capital Audio, CHS, Coborn's, Crystal Rock, D'Agostino, Discount Optics, Jetro, Leon's Transmission, NACS, NATSO, NCPA, N.G.A., NRA, Parkway, and Payless bring this action under Federal Rules of Civil Procedure 23(a), and (b)(3), on behalf of themselves and Class I.  These Plaintiffs are members of Class I, their claims are typical of the claims of the other Class I members, and Plaintiffs will fairly and adequately protect the interests of Class I.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation.  Plaintiffs' interests are coincident with, and not

- 37 -

antagonistic to, those of the other member of Class I.

110.    Plaintiffs Photos Etc., Traditions, Capital Audio, CHS, Coborn's, Crystal Rock, D'Agostino, Discount Optics, Jetro, Leon's Transmission, Parkway and Payless bring this action under F.R.C.P. 23(a) and (b)(2), on behalf of themselves and Class II.  These Plaintiffs are members of Class II, their claims are typical of the claims of the other Class II members, and Plaintiffs will fairly and adequately protect the interests of Class II.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of Class II.

111.    Plaintiffs AFMW, NACS, NATSO, NCGA, NCPA, N.G.A., and NRA bring this action under F.R.C.P. 23(a) and (b)(2), on behalf of their members and Class II.  These Plaintiffs' members are members of Class II, their members' claims are typical of the claims of the other Class II members, and these Plaintiffs will fairly and adequately protect the interests of Class II.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation.  Plaintiffs' members' interests are coincident with, and not antagonistic to, those of the other members of Class II.

112.    The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members. The Class Members are so numerous that joinder of all members is impracticable.

113.    Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform.  Common questions of law and fact will predominate over any individual questions of law and fact.

114.    Defendants have acted, continue to act, refused to act, and continue to refuse to act

- 38 -

on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Class Members as a whole.

115. There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

    a.    Conspiracy issues.

        i.    Whether (a) Visa and its Member Banks, and (b) MasterCard and its Member Banks illegally fixed uniform schedules of default Interchange Fees for Credit Card transactions, which were imposed on Merchants in the market for Network Services for such cards, thereby extracting supracompetitive Interchange Fees and Merchant Discount Fees from Class Members;

        ii.    Whether (a) Visa and its Member Banks, and (b) MasterCard and its Member Banks illegally fixed uniform schedules of default Interchange Fees for Offline Debit Card transactions, which were imposed on Merchants in the market for Network Services for such cards, thereby extracting supracompetitive Interchange Fees and Merchant Discount Fees from Class Members;

        iii.    Whether (a) Visa and its Member Banks illegally fixed uniform schedules of default interchange fees for Interlink PIN Debit Card transactions, which were imposed on Merchants in the market for Network Services for such cards, thereby extracting supracompetitive Interchange Fees and Merchant Discount Fees from Class Members;

        iv.    Whether Visa, MasterCard and their Member Banks possess or exercise market power or monopoly power in the Relevant Markets alleged in this Complaint;

        v.    Whether Visa and MasterCard and their dual Member Banks conspired with each other to fix the price of Interchange Fees imposed on Class Members in the Relevant Market;

        vi.    Whether the Merchant restraints imposed by Defendants facilitated Defendants' respective price-fixing arrangements;

- 39 -

          vii.     Whether the conspiracies of the Visa and MasterCard Networks continued after the Networks' reorganizations and IPOs; and

          viii.    Whether the *per se* rule or the rule of reason should be applied to analyze the price-fixing schemes of Visa, MasterCard, and their respective Member Banks.

    b.    Monopolization issues.

          i.     Whether Visa and its Member Banks exercise market power or monopoly power that was willfully acquired and/or maintained, in various markets as alleged in this Complaint; and

          ii.    Whether MasterCard and its Member Banks exercise market power or monopoly power that was willfully acquired and/or maintained, in various markets as alleged in this Complaint.

    c.    Impact and damages issues.

          i.     Whether virtually all class members were overcharged for Visa and MasterCard transactions when higher Interchange Fees were extracted from them than could have occurred in a competitive market;

          ii.    Whether Interchange Fees would exist at their current level – if at all – absent the above-referenced conspiracies; and

          iii.   The proper measure of damages sustained by the Class I as a result of the conduct alleged herein.

116.    These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual class members.

117.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

118.    This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by many Class Members are small in relation to the expense and

- 40 -

burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

119. A class virtually identical to Class Members alleged herein above was certified, and affirmed on appeal, in *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001).

## VIII.

## FACTUAL ALLEGATIONS

### A.      The Evolution of the Visa and MasterCard Networks

120. Visa and MasterCard (collectively the "Networks") are international bank-card networks whose members include banks, regional-banking associations, and other financial institutions. The Networks were established by their members to develop, promote, and operate national Credit Card networks.

121. The Networks evolved from regional and local Credit Card systems formed during the 1960's.

122. Visa's predecessor, Bank Americard, was the local Credit Card program of Bank of America, then based in California.  In 1970, the program was introduced throughout the United States under the name National Bank Americard, Inc. ("NBI").  In 1977, NBI changed its name to Visa.

123. MasterCard is the successor to Mastercharge, which was created in 1967 when the Interbank Card Association of New York banks merged with the Western States Bankcard Association.

124. During the early years of the Networks, Merchants that accepted Credit Cards used paper forms called "drafts" to conduct transactions.

125. In the mid 1980's, technology evolved such that many transactions were processed

- 41 -

electronically and paper drafts were not needed for most Payment Card transactions. Since that time, the costs to Visa and MasterCard of the various components of Credit Card transaction processing (for example, computer hardware, telephone service, network service, and data-processing services) have decreased significantly. These changes led to significant reductions in the costs for Visa and MasterCard of processing Payment Card transactions.

126.    Since Visa and MasterCard began operating on a national scale, use of their cards has increased dramatically. In 1970, only 16% of households had a credit card. By 2006, 77% of U.S. adults had at least one credit card.

127.    Since 1970, the number of Visa Member Banks has increased from approximately 1,400 to nearly 14,000 in the United States and over 22,000 worldwide. U.S. consumers now carry more than 512 million Visa-branded Credit, Debit, commercial, and prepaid cards.

128.    MasterCard has experienced similar growth and now includes more than 23,000 Member Banks worldwide. During 2006, there were over 360 million MasterCard-branded cards in circulation in the United States.

129.    The Networks have also experienced substantial consolidation among their Member Banks. For example, in 2006 Bank of America acquired MBNA and immediately became the second largest issuer of Credit Cards in the United States. Similarly, in 2004 when Chase – then already the nation's fourth largest card issuer – acquired Bank One, the combined entity became the largest issuer in the United States, accounting for 23.5% of all General Purpose Card transaction volume. After Chase's acquisition of the Washington Mutual assets described in paragraph 88 Chase's share of GPC transaction volume is estimated to be 25% of the credit card market.

130.    In 2007, the top five Visa Credit Card-Issuing Banks accounted for 69.7% of all Visa Credit Cards in circulation in the United States.

- 42 -

131.    In 2007, the top five MasterCard Credit Card-Issuing Banks accounted for 75.8% of all MasterCard Credit Cards in circulation in the United States.

132.    In 2007, the top five Credit Card-Issuing Banks accounted for 71.4% of all Visa and MasterCard purchase volume in the United States.

133.    In 2007, 72.9% of Visa and MasterCard transaction volume was acquired by five Member Banks.

134.    Unlike Payment Card transactions in other jurisdictions, the fees imposed by banks on Merchants for Payment Card transactions in the United States are almost completely unregulated by any level or unit of government.  Rather, those fees, and the rules that apply to all Payment Card transactions, are privately and comprehensively regulated by Visa, MasterCard, and their Member Banks.  Thus, the Relevant Market alleged in this complaint can reach an equilibrium between supply and Merchants' demand for those services only if market forces are effective.  At all times relevant to this action, Visa, MasterCard and their Member Banks have conspired to restrain competitive market forces.

### B.    Visa and MasterCard Utilized Their Dominance in Credit Cards to Become the Dominant Debit Card Networks

135.    Visa and MasterCard initiated their Visa Check and MasterMoney (the predecessor to MasterCard Debit) programs in 1979.  At that time, Offline Debit Card transactions represented only a small portion of all Payment Card transactions.

136.    At that time, PIN-Debit networks were beginning to spring up from regional ATM networks.  Before the early 1990s, PIN-Debit networks operated successfully either without Interchange Fees, or with "negative" Interchange Fees, whereby the Merchant received a small sum of money on each transaction to incent it to install PIN pads, the equipment necessary at the point-of-sale for a Merchant to accept a PIN-Debit transaction.

- 43 -

137.    The Interchange-Fee-free period of PIN-Debit networks came to a close, however, when Visa acquired the Interlink network and soon thereafter imposed an Interchange-Fee rate equivalent of 45 cents on a 100 dollar purchase.

138.    Offline Debit Cards carried higher Interchange Fees than PIN-Debit Cards, and therefore were slow to gain Merchant acceptance.  Accordingly, in the early 1990s, PIN-Debit transactions accounted for over 60% of all Debit Card transactions.  At that time, PIN-Debit transactions were growing at a rate of 40% annually and were poised to grow even faster.

139.    Because of the rapid growth in PIN-Debit transactions and the superiority of the PIN-Debit product, Visa's advisors predicted that PIN-Debit would wipe out Offline Debit.

140.    PIN-Debit also had the potential to eat into Credit-Card transaction volume, and thereby drive down Credit-Card Interchange Fees.  The Regional PIN-Debit networks were viewed by the Networks as potential threats to their dominance in the market for General Purpose Payment Card Network Services.

141.    To counteract the slow growth in Merchant acceptance of Offline-Debit Cards, the Networks required Merchants that accepted their dominant Credit Cards to also accept their Offline Debit Cards.

142.    By tying their Offline Debit Cards to their dominant Credit Cards, Visa and MasterCard increased the number of Visa Check and MasterMoney cards to over 47 million by 1996.  By 2004, the number of Visa and MasterCard Offline Debit Cards in circulation had grown to 228 million.

143.    The tying practices described above led to a lawsuit by a class of Merchants, in which this Court granted partial summary judgment for the class and denied summary judgment for the defendants.  *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y.

- 44 -

Apr. 1, 2003).

144.    After the court's summary-judgment ruling in *Visa Check*, Visa and MasterCard entered into settlement agreements with the class, which required Visa and MasterCard to abandon the part of their "Honor All Cards" rules that required Merchants that accepted Visa and MasterCard Credit Cards to also accept the Networks' Offline Debit Cards.

145.    Fearing that Merchants would abandon its more expensive Offline Debit cards, Visa utilized its market power to cause "convergence" of PIN-Debit and Offline Debit Interchange Fee rates. Through this "convergence" strategy, Visa sought to increase the Interchange Fee levels on its Interlink PIN-Debit transactions both to decrease the incentive of Merchants to steer consumers to PIN-Debit transactions away from Offline Debit transactions and to incent banks to issue Interlink cards.  Visa's ultimate goal is to eliminate the competitive threat of PIN-debit networks that are not dominated by Visa Member Banks by making Merchants indifferent at the point of sale between PIN-Debit and Offline Debit.

146.    Visa has offered incentives to Issuing Banks to become exclusive issuers of Interlink PIN-Debit Cards. Although MasterCard has at times provided superior economic offers to these banks for issuance of Maestro PIN-Debit cards, banks have been migrating to Interlink, based on Visa's promise that once Interlink achieves a significant share of Debit Card transactions, Visa will gain greater pricing power. With this increased pricing power in hand, Visa plans to expedite the "convergence" in Interchange rates between PIN-Debit and Offline Debit transactions, which will permanently marginalize the competitive threat from the PIN-Debit Networks.

147.    Even after rescinding parts of the Honor All Cards Rule as required by the settlement in *Visa Check*, Visa has continued its anticompetitive practices in the Debit Card market. For example, it has recently waived the requirement for some Merchants that they obtain the

- 45 -

cardholders's signature on Credit Card and Debit Card transactions under 25 dollars. Visa enacted a rule, however, that prevented this exception from applying when a consumer wished to use his or her card as a PIN-Debit card. In those instances, the consumer would have to enter a PIN regardless of the transaction amount. Recognizing the anticompetitive effects of this discrimination, the Department of Justice opened an investigation into Visa's practices. After the investigation was initiated, Visa agreed to repeal the prohibition on waiving the PIN-entry requirement.

### C.     Interchange Fees In The Context Of A Payment-Card Transaction

148.    The Networks operate as standard-setting organizations in the markets for General Purpose Card Network services, Offline Debit Card Network Services and PIN-Debit Card Network Services that facilitate the exchange of transaction data and funds among Merchants, Acquiring Banks, Issuing Banks, and consumers.

149.    When a consumer makes a payment with a Credit or Offline Debit Card, the Merchant sends an electronic transmission to its Acquiring Bank or Third-Party Processor. The Acquiring Bank or processor then sends an electronic transmission to the Networks. The Networks relay the transaction to the cardholder's Issuing Bank or its Third-Party Processor, which makes a payment to the Acquiring Bank, through the Networks for the purchase amount minus the Interchange Fee. The Acquiring Bank then credits the Merchant's account for the transaction amount minus the Merchant-Discount Fee, the largest component of which is the Interchange Fee. Finally, the Issuing Bank charges the cardholder's credit account for the full amount of the purchase. Under this system, the Issuing Bank earns revenue from annual fees and interest charged to cardholders, as well as the amount of the Interchange Fee, while the Acquiring Bank earns revenue from the difference between the Merchant-Discount Fee and the Interchange Fee.

- 46 -

150.    Visa's Operating Regulation 9.5 (2006) requires that Visa's default Interchange Fee applies to every Visa transaction in which the Issuing and Acquiring Banks have not executed a bilateral Interchange Fee agreement.

151.    Similarly, Rule 10.4 of MasterCard's Bylaws and Rules requires that the MasterCard default Interchange Fee applies to every MasterCard transaction in which the Issuing and Acquiring Bank have not executed a bilateral agreement.

152.    A typical transaction is depicted below:



153.    When a consumer makes a payment with a PIN-Debit card, the consumer swipes a Payment Card at a POS terminal and enters a (usually four-digit) personal identification number ("PIN") on a numeric keypad. After the PIN is entered, the POS terminal transmits the transaction and Payment Card information to an Acquiring Bank or Third-Party Processor acting on the bank's behalf. The Acquiring Bank or processor then sends the information to the PIN-Debit Network, which then switches the transaction to the Issuing Bank or a Third-Party Processor acting on its behalf. The Issuing Bank or its processor assesses the consumer's account to verify the PIN and

- 47 -

ensure that the consumer has sufficient funds to pay for the purchase. Next, the Issuing Bank or its processor sends an electronic message to the PIN-Debit network, which indicates acceptance or rejection of the transaction for the purchase amount minus the Interchange Fee. The PIN-Debit network switches the Issuing Bank's reply back to the Merchant through the Acquiring Bank or its processor to complete the transaction. This entire "authorization" process takes place in just seconds. In the same transaction, the Merchant's acquirer "purchases" the transaction from the Merchant, guaranteeing payment and facilitating settlement of the transaction.

154.    While the payment process for a PIN-Debit transaction appears on the surface to be similar to that of an Offline Debit Card transaction, the processing of those transactions is quite different. While Offline Debit Card transactions are processed over Credit-Card Networks, and in two separate electronic messages (one for authorization and another for clearance and settlement), PIN-Debit Card transactions are authorized, cleared and settled with a single message.

155.    The Networks monitor and enforce their Member Banks' compliance with their uniform schedule of default Interchange Fees. Absent a bilateral agreement between the issuing and acquiring banks to a particular transaction, the Networks' IT-systems monitor each transaction to ensure that the "correct" default interchange rate is being applied. Thus, if the acquiring bank attempted to "cheat" on a particular transaction by applying an interchange rate lower than the default rate, the Networks' systems would intervene and increase the interchange rate to the default rate.

156.    Visa and MasterCard rules also require that a Member Bank be a party to every Merchant contract for the acceptance of Visa and MasterCard Payment Cards.  This rule applies even to Merchants and banks that use Third-Party Processors or Independent Sales Organizations. *See* Visa U.S.A. Op. Reg. § 4.2 (2006); MasterCard International Inc. Bylaws and Rules, R. 7.4 &

- 48 -

9.1 (2005).

157.  Visa and MasterCard do not use the Interchange Fee to fund their operations. Rather, the Interchange Fee is retained by the Issuing Bank on every transaction. The majority of Visa and MasterCard revenues are derived from fees and assessments that the Networks charge Member Banks. These fees include fees for authorization and clearing of transactions, network-access fees, currency-conversion fees and various other service fees Visa and MasterCard assess Member Banks. In addition, based on the gross daily volume of these banks' transactions, Visa and MasterCard are increasingly relying on fees rather than assessments to fund their operations.

158.  The Networks can and do perform their functions of authorizing and clearing Credit Card and Debit Card transactions, acting as standard-setting entities for Credit and Debit Card transactions, promoting their respective networks, and paying other operating expenses through the operations fees and assessments that their Member Banks pay.

159.  Before their respective IPOs, Visa and MasterCard did not act as single entities when their Member Banks collectively fixed Interchange Fees. The Visa and MasterCard Member Banks, which  effectively controlled the decisions of  the Networks, competed against each other in the Relevant Markets. These banks do not nor did they ever share a unity of interest. Rather, they are direct, horizontal competitors in the Relevant Markets.

160.  The Member Banks did not pool all of their assets to form or operate the Visa and MasterCard networks.

161.  Before the Networks' IPOs, the Member Banks did not owe a fiduciary duty to each other or the Visa and MasterCard networks with respect to the setting of Interchange Fees.

162.  The Member Banks of Visa and MasterCard impose Interchange Fees on Merchants even for On-Us Transactions, in which the Issuing and Acquiring Banks are the same bank.

- 49 -

163.     Before the Visa and MasterCard IPOs, the Bank Defendants, acting as members of Visa by and through the Visa Board of Directors, fixed uniform Interchange Fees for various Merchants and transactions for all Visa General Purpose Card and Debit Card transactions that they agreed to impose upon Merchants.

164.     The Bank Defendants, acting by and through the Board of Directors of MasterCard, then set similar uniform Interchange Fees for various Merchants and transactions for all MasterCard General Purpose Card and Debit Card transactions that they agreed to impose upon Merchants.

165.     Before the Visa and MasterCard IPOs, by jointly setting Interchange Fees in both Networks, the Bank Defendants ensured that the Interchange Fees of Visa and MasterCard increased in parallel and stair-step fashion, rather than decreasing in response to competition from each other.  Even after the IPOs, the Bank Defendants and other Member Banks continue to act as information conduits for the sharing of pricing and other competitive information between the Networks, thereby ensuring that the Networks' Interchange Fees continue to increase in parallel and stair-step fashion.

166.     Interchange Fees were devised in the early days of the Networks.  Interchange Fees purportedly helped pay for the costs of initial card issuance, marketing, transferring transactional paper between Acquiring and Issuing Banks, and purportedly balanced Network costs between Issuers and Acquirers.  These early Interchange Fees were cost-based, and in the case of Visa, set with the help of independent auditing firms.

167.     Credit Card Interchange Fees were purportedly necessary in the early days of the Networks to induce banks to issue cards to cardholders.

168.     Even if those initially proffered justifications for collectively set, uniform schedules

- 50 -

of Credit Card Interchange Fees once were valid, they no longer are valid. Interchange Fees are no longer cost-based, and the Networks no longer need to incent card issuance to establish their Networks.

169.    Technology has greatly evolved since the early days of the Networks, such that the Networks now have the technological capability to facilitate bilateral agreements among Issuing Banks, Acquiring Banks, and Merchants and to facilitate the settlement of funds pursuant to those bilateral agreements.

170.    Issuers, for their part, have the technological capability to enter into bilateral agreements with Merchants and to settle transactions pursuant to such a bilateral agreement.

171.    Unlike in the early days of the Networks, Visa and MasterCard now, jointly and separately, have market power in the market for General Purpose Card Network Services. Even in the face of frequent and significant increases in Interchange Fees, Merchants have no choice but to continue to accept Visa's and MasterCard's dominant Credit Cards. *United States v. Visa*, 163 F. Supp. 2d at 340, *aff'd*, 344 F.3d at 240. In recent years both Visa and MasterCard repeatedly and substantially increased the total Interchange Fees paid by Merchants, but did not experience any decline in Merchant acceptance.

172.    The collective setting of Interchange Fees neither performs the standard setting function of Visa and MasterCard, nor enables the Networks to perform that function.

173.    Visa and MasterCard also have market power in the market for General Purpose Card Network Services. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, (E.D.N.Y. Apr. 1, 2003) (finding that Visa has market power as a matter of law and that fact issues remained with respect to MasterCard).

174.    Therefore, given the ubiquity of Visa and MasterCard Payment Cards, banks now

- 51 -

would find it in their best interest to issue Visa and MasterCard Payment Cards and acquire Merchants for the Networks, even without the promise of supra-competitive Interchange Fee revenues.

175.   The Visa and MasterCard networks could function efficiently without rules requiring the payment of Interchange Fees on every transaction.  Even if the Member Banks of Visa and MasterCard did not fix and agree to abide by uniform schedules of default Interchange Fees, the Visa and MasterCard Networks could continue in their roles as standard-setting organizations for Payment Card transactions.  Many examples of similar networks exist that function efficiently without rules requiring the payment of Interchange Fees on every transaction.  These include the Interac debit card network in Canada, and domestic Payment Card networks in Norway, The Netherlands, Denmark, Finland, Luxembourg and Iceland.  There are even more examples of networks that operate efficiently with dramatically lower Interchange Fees, including payment card networks in all other industrialized countries.  These include Australia, The United Kingdom, Mexico, and Spain.

176.   The uniform schedules of Interchange Fees and rules requiring the payment thereof are not a core function of the Visa and MasterCard Credit and Offline Debit networks.  They are not reasonably necessary to the operation of the Visa and MasterCard networks.  Even if some Interchange Fees were reasonably necessary, Defendants' uniform schedules of Interchange Fees are more restrictive of competition than is necessary to effectuate the business of Visa and MasterCard.

177.   Unlike the early days of Visa and MasterCard when Interchange Fees were purportedly based on certain issuer costs, the Networks now set their Interchange Fees based upon their perceptions of the elasticity of demand of Merchants.  This permits the Networks and their

- 52 -

Member Banks to identify and impose on each category of Merchants an Interchange Fee that approximates the "reservation price" of Merchants in that category.  This is the pricing strategy typically associated with firms that possess substantial market power.

### D. Acquiring Banks Of Visa And MasterCard Have No Ability Or Incentive To Seek Redress For The Collective Fixing Of Interchange Fees

178.    Visa U.S.A.'s Operating Regulation 1.15 specifies that "Visa has no liability of any nature to any Member arising from any cause or circumstance."  Regulation 1.15A clarifies that the liability limitation "appl[ies] to all products, programs, services, specifications, standards or other matters or items provided by [Visa and its Member Banks]."  Thus, if a Visa Member Bank determined that it was harmed by the uniform schedules of Interchange Fees, Regulation 1.15A prevents it from suing Visa.

179.    MasterCard's Bylaw 1.1 states that "[e]ach member shall…hold harmless [MasterCard]…from any actual or threatened claim, demand, [or] obligation,…resulting from and/or arising in connection with…the compliance or non-compliance with the standards by the member."  Thus, if a MasterCard Member Bank determined that it was harmed by the uniform schedules of Interchange Fees, Bylaw 1.1 prevents it from suing MasterCard.

180.    In a technical manual issued to its Member Banks, MasterCard states that "MasterCard shall have no liability to any member, member processor, or other person acting on behalf of the member for any loss, cost, or other damage arising out of or in connection with MasterCard's administration of or any member's participation in any interchange rate program." MasterCard Int'l, GCMS Reference Manual.

181.    Even if Visa and MasterCard Member Banks were not explicitly prevented from suing Visa and MasterCard over the uniform schedules of Interchange Fees, they have no practical incentive to do so.

182.    The Bylaws of Defendant Visa U.S.A. require that all "Principal Member [Banks]," which include the Bank-Defendant members of Visa U.S.A. and the vast majority of all Member Banks, "[s]hall issue Cards bearing the Visa service mark."  Visa U.S.A., Bylaws § 2.04(a) (May 15, 2004).

183.    Similarly, MasterCard's Bylaw 2.9 (2005) requires that Member Banks "must have issued and outstanding a reasonable number of MasterCard cards."  If a Member Bank fails to issue the requisite number of cards, it will be assessed a penalty by the MasterCard network.  The reason for these provisions is for all Member Banks to have a common economic interest in even-rising Interchange Fees.

184.    Because all Member Banks are required to issue Visa or MasterCard Payment Cards, all Member Banks benefit from the supracompetitive Interchange Fees that they agree to abide by and, at least until the Networks' reorganizations, collectively set.  Moreover, because acquiring banks do not pay Interchange Fees, they have no economic incentive to sue over the Networks' Interchange Fees.

185.    Before the IPOs, the Member Banks appointed the Networks' Boards of Directors and approved of and agreed to abide by the Networks' rules and bylaws.  Before the IPOs, the Member Banks conspired with each other and with Visa and MasterCard to collectively fix uniform schedules of default Interchange Fees.  At all times relevant to these claims, the Member Banks have agreed to abide by the rules of Visa and MasterCard, including the rules that require the application of a default Interchange Fee on every Visa and MasterCard transaction.

186.    Third-Party Processors do not have any practical incentive or ability to seek redress for the Networks' supracompetitive Interchange Fees.

187.    Third-Party Processors do not pay Interchange Fees and therefore have not been

- 54 -

harmed by the imposition of those fees.

188.    Therefore no realistic possibility exists that any Third-Party Processor will sue Visa or MasterCard over any of the practices described in this Complaint.

**E.    The Anti-Steering Restraints Insulate Visa and MasterCard From Inter-Network Competition In The General Purpose and Debit Card Network Services Markets, Among Other Anticompetitive Effects**

189.    Because consumers do not know the actual costs of the Interchange Fees and Merchant-Discount Fees paid by Merchants, Merchants are unable to assist them in choosing more cost-effective payment methods.

190.    Visa and MasterCard impose the No-Surcharge Rule and other Anti-Steering Restraints to prevent Merchants from incenting consumers to use less-expensive payment methods. *See* Visa U.S.A. Op. Reg. 5.2F (2006); MasterCard Op. R. 9.12.  By implementing and enforcing these rules, Visa and MasterCard have fully insulated themselves from any competitive threat.  It is the consumer who selects which card to use in making a purchase.  The No-Surcharge Rule and other Anti-Steering Restraints guarantee that the consumer will make this selection without regard to the cost to the Merchant of accepting the card; the consumer cannot know how expensive his or her chosen card is to the Merchant, because the Anti-Steering Restraints ensure that the costs of the transaction will be borne, but without his or her knowledge.

191.    The No-Surcharge Rule is reflected in the rules and Merchant agreements of Visa, MasterCard, and their Member Banks.   Visa's Operating Regulation 4.2 and MasterCard's Bylaw 9.8 and Operating Rule 9.1.2 mandate that Merchant agreements require Merchants to abide by their respective operating regulations, which include the Anti-Steering restraints.

192.    Under the Bank Defendants' standard-form Merchant agreements, Merchants "shall not impose any surcharge or fee for accepting a [Visa-branded or MasterCard-branded] Card."  The MasterCard Member Service Provider Rules Manual, published April 2005, likewise admonishes

- 55 -

Merchants that they "must not directly or indirectly require any MasterCard cardholder to pay a surcharge" (§ 9.12.2), and the Card Acceptance and Chargeback Management Guide for Visa Merchants, revised October 2007, provides "you may not impose any surcharge on a Visa transaction."

193.    Accordingly, a Credit or Debit Card Network that charges Merchant-Discount Fees that are lower than the Defendant Associations will not be able to make inroads on the monopoly positions of Visa and MasterCard.  While potential new market entrants and competitors such as Discover stand ready, willing, and able to compete with the Defendants by offering lower fees charged to Merchants, the Defendants' rules prevent and restrain any such competition by ensuring that increased efficiency and lower prices will not lead to increased market share for competitors in the Network-Services Markets.

194.    Likewise, the Anti-Steering Restraints have a profound inflationary effect on retail goods and services.  The Defendants' rules ensure that Merchants seeking to pass along these costs must raise prices to all consumers, including cash-payers, PIN-Debit Card users, and those who would otherwise seek to avoid the high cost of Defendants' Interchange Fees.  But for these rules, consumer prices would be lower.  The prices of goods and services would fall because those prices would no longer be marked up to reflect the supracompetitive costs of Credit Card acceptance.  Instead, those supracompetitive prices would be borne by the consumer choosing to use the Defendants' expensive payment products.  Faced with transparent high prices for Defendants' Payment Cards, consumers would seek to use lower cost forms of payment.

195.    In fact, MasterCard admitted, in a submission to the Reserve Bank of Australia, that surcharging can place downward pressure on Merchant fees because "[Networks] set interchange fees to avoid widespread surcharging and other forms of card usage discouragement behavior."

- 56 -

Payment System Regulation, Response by MasterCard Worldwide to the Issues for the 2007/08 Review. Visa has made similar statements.

196. Similarly, Robert Towne, Visa's former Senior Vice President of "acceptance economics," admitted that he believed that charges imposed by Merchants on cardholders would suppress consumers' demand to use Visa-branded Payment Cards. (Towne Dep. 373:24-375:8.)

197. In addition to insulating Defendants from competition and raising prices for all consumers, the No-Surcharge Rule compels inequitable and anticompetitive subsidies, running from the least-affluent U.S. consumers to the most-affluent. Because Merchants must mark up the prices of all goods to cover the costs of accepting Visa and MasterCard products, rather than impose a discrete surcharge on users of those products, the No-Surcharge Rule effectively compels cash payers and users of other low-cost payment forms to subsidize all of the costly perquisites given by Issuing Banks to consumers using more expensive payment forms such as Visa and MasterCard Payment Cards, including frequent-flier miles, rental-car insurance, free gifts, and even cash-back rewards.

198. The other Anti-Steering Restraints also serve to protect the Defendants' elevated Interchange Fees. In the face of Merchant prompting — and particularly faced with the prospect of incurring surcharges — consumers would migrate towards less-expensive payment products, causing Defendants to drop their Interchange Fees in order to maintain market share. In the absence of the Anti-Steering Restraints, therefore, Defendants' Interchange Fees, would be lower.

199. Finally, no procompetitive justification exists for the Anti-Steering Restraints. These rules are naked restraints on trade, are not ancillary to the legitimate and competitive purposes of the Defendant Networks, and have profound anticompetitive effects.

> **E.** **Defendants Tie And Bundle Several Distinct Services In Their Interchange Fees And Enter Into Agreements With Merchants For The**

**Exclusive Provision Of Those Services**

200.    In order to reinforce their other anticompetitive agreements, the Defendants mischaracterize the Interchange Fee as a "payment" for services, and tie and bundle together separate and distinct services purportedly "paid for" by the Interchange Fee.

201.    The Networks purport to justify Interchange Fees by claiming those fees "pay for" the costs of many separate and distinct services, including the Payment-Card-System Services, the "Float" of funds from the Issuing Bank to the consumer during the Grace Period, the promotional costs of the Issuing Banks, Network-Processing Services, and Payment-Guarantee Services.

202.    In effect, Visa and MasterCard require that all Merchants that accept Visa and MasterCard Payment-Card-System Services also purchase Payment-Guarantee Services and Network-Processing Services from Visa and MasterCard.

203.    By mischaracterizing the Interchange Fee as a "payment" for services, Visa, MasterCard, and their Member Banks bundle together the prices for the separate and distinct services in their Interchange Fees, such that Merchants are required to pay the full Interchange Fee, even if they desire and are able to purchase Network-Processing Services or Payment-Guarantee Services from a competitor of Visa and MasterCard.

204.    Because the prices for these separate and distinct services are bundled together, Merchants have no practical ability to purchase Network-Processing Services or Payment-Guarantee Services from competitors of Visa and MasterCard, so as to reduce the Interchange Fees they are charged.

205.    If Visa, MasterCard, and the Bank Defendants did not tie and bundle together these separate and distinct services, many Merchants could, and would, choose to purchase the Payment-Guarantee Services from other vendors or would choose to self-insure against fraud, for the purpose of reducing the Interchange Fees they are charged.  Even those Merchants that choose to purchase

- 58 -

Payment-Guarantee Services from Visa and MasterCard would benefit from Visa and MasterCard lowering their prices for those services in response to competition from other providers of these services.

206.    If Visa and MasterCard did not require Merchants to use Visa and MasterCard Network-Processing Services on all Visa and MasterCard Credit Card and Debit Card transactions, many Merchants would choose to process those transactions through a Third-Party Processor of Payment-Card transactions.  All Merchants would benefit from the untying of Network-Processing Services from General Purpose Card Network Services, because Visa and MasterCard would then have to compete with Third-Party Processors to offer cheaper and more-efficient Network-Processing Services.

207.    Third-Party Processors have the technical capability to bypass the Visa and MasterCard Network-Processing Services mechanism on intra-processor transactions and On-Us Transactions in which the Member Bank uses a Third-Party Processor.

208.    The Member Banks of Visa and MasterCard are also potential competitors in the market for Network-Processing Services.  But for the tying arrangement described herein, Member Banks or their Third-Party Processors could process On-Us Transactions and avoid paying that part of the Interchange Fee that purportedly covers the cost of Network-Processing Services.

209.    One third party processor, First Data Corporation, proposed that all transactions for which it acted as both the Merchant/acquirer's processor and the issuer's processor be processed over First Data's network, and bypass Visa's network.  Visa sued First Data to prevent it from processing Visa transactions outside of the Visa network, and First Data counterclaimed alleging that Visa was engaging in anticompetitive activity.  Chase, which was a large issuer of Visa-branded cards, and a joint venturer with First Data in the business of Merchant/acquirer processing,

- 59 -

helped to broker a settlement between the two by encouraging Visa to get out of the Merchant/acquiring processing business and encouraging First Data to forego its plans to establish an alternative network. First Data and Visa ultimately settled their litigation in effect agreeing to allocate these markets, and First Data has not pursued its plans for an alternative network and Visa has reduced its Merchant processing activities.

210. Defendants' tying and bundling of the fees for these separate and distinct services prevents other firms from competing on the merits to offer those services independently and at lower prices to Merchants.

### F.  Duality Facilitates Interchange-Fee Fixing And Anticompetitive Restraints

211. Since 1976, Visa's and MasterCard's rules have permitted banks to be members of both Visa and MasterCard and issue both brands of Credit Cards. This is referred to as "Issuance Duality." Banks could also "acquire" transactions from Merchants for both Visa and MasterCard. This is referred to as "Acquiring Duality." Every major bank in the United States is a member of both Visa and MasterCard, and thus has the right to  issue Payment Cards and acquire Merchants for both the Visa and MasterCard networks. The U.S. memberships of Visa and MasterCard are virtually identical. Furthermore, virtually every Merchant that accepts Visa Payment Cards as a form of payment also accepts MasterCard Payment Cards.

212. Very few exceptions to Duality exist among the thousands of financial institutions that issue Visa and/or MasterCard Credit Cards and the financial institutions that acquire retail stores for Visa and/or MasterCard. Each of the Bank Defendants is a member of both networks.

213. Although Visa's rules prohibit banks from issuing both Visa and MasterCard Offline Debit Cards, virtually all Visa Check Card-Issuing Banks are members of MasterCard and virtually all MasterCard Debit-Issuing Banks are members of Visa. Therefore, many of the Debit Card

operations of the Networks are transparent to the competing Network, and the Debit Card Issuing Banks of the Networks have a profit motive to restrain inter-Network competition that might result in lower interchange fees.

214.   Visa and MasterCard Member Banks have historically exerted control over the operations of the competing Visa and MasterCard networks by simultaneously participating on the Boards of Directors and other important committees of the Networks.  For example, MasterCard's Business Committee and Visa's Marketing Advisors Committee advise their respective network's professional staff and management on key strategic and competitive issues.  In 1996, 12 of the 21 banks represented on Visa's Board of Directors were also represented on MasterCard's Business Committee, and 17 of the 27 banks on MasterCard's Business Committee had representatives on Visa's Marketing Advisors Committee.  Seven of the 22 banks represented on MasterCard's Board of Directors also were represented on Visa's Marketing Advisors Committee.

215.   As of year-end 1996, approximately 19 banks had both a representative on the Board of Directors of one network and at least one important committee of the other network.

216.   Most of the Bank Defendants have one or more employees tasked with being the bank's liaison to the Networks.  Oftentimes, the same employee or employees act as liaisons to both Networks.

217.   The Network Defendants and the Bank Defendants abuse the structure of duality to pass sensitive information between the two Networks, which helps guarantee that the Networks' Interchange Fees continue to increase in parallel and stairstep fashion.

- 61 -

218.   The Member Banks' participation in the governance and operations of the competing Networks has continued into the relevant time period in this lawsuit.  For example, in 2006, five of the eight bank representatives on the Visa U.S.A. Board sat on a MasterCard advisory board or council.  In addition, five out of 13 banks that were represented on the U.S. Board of Directors of MasterCard had a representative on at least one of Visa U.S.A.'s executive councils.The situation of Defendant Chase illustrates the influence of a given Member Bank over the affairs of both Networks.  In 2006, Chase sat on seven advisory boards of MasterCard at the same time as it was represented on Visa's board.

219.   The advisory boards, in which Chase employees participated, or in which "open" seats were available to Chase, related to important aspects of MasterCard's business and included the following:  U.S. Business Committee, Commercial Card Business Committee, Acquiring Committee, Debit Advisory Committee, Legal Advisory Committee, and the International Security Committee and International Operations Committee of MasterCard International.

220.   In 1992, MasterCard International's Executive Vice President and General Counsel wrote in a letter to the Department of Justice that "when one board acts with respect to a matter, the results of those actions are disseminated to the members who are members in both organizations. As a result, each of the Associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in the normal corporate environment."  High-ranking Visa executives have also noted the anticompetitive effects of the banks' longstanding dual membership in and ownership of Visa and MasterCard.  For example, in 1992, Visa International's former President and CEO explained that

> "Visa was a better organization [before its owners acquired an interest in MasterCard. I]t created more, it was more innovative, it was more vital and more imaginative. . . . The real creativity, ingenuity, desire to develop, [and] support from members that made Visa what it is today came before duality

because there were groups of banks who wanted to support Visa to go beat up on MasterCard, and there were groups of banks in MasterCard who wanted to support MasterCard to go beat up on Visa. And they weren't sitting there as shareholders of both organizations not really caring who beat up on whom or if they didn't beat up on anyone or not caring who won. If you've got one foot firmly placed on both sides of the street, who cares. . . . [a]nd I think that not only would the banks have benefited had they gone this way [without duality], but ultimately the consumer would, too . . . ." Compl. ¶ 60, *United States v. Visa U.S.A., Inc. et al.*, No. 98-civ.7076 (S.D.N.Y. Oct. 7, 1998).

That same year, Visa International's Executive Vice President and General Counsel testified that "it is very difficult for us to take a step, an aggressive step that hurts MasterCard because the same banks who sit there on the board, who are in Visa are also in MasterCard." In response to the question whether "duality has led to a decrease in intersystem competition between Visa and MasterCard," he replied, "Absolutely," and when asked whether duality harmed consumers, he answered "I think in the long run they would be better off without duality . . . ." *Id.* ¶ 61.

221.    Before their respective IPOs, the Networks were essentially controlled by a small number of Member Banks — those with the largest shares of card issuance and with the highest sales-transaction volumes — including each of the Bank Defendants.  These banks established their control by simultaneously serving on the Boards of Directors and/or important committees of either or, in many cases, both Visa and MasterCard.  This relationship among Member Banks and the Networks has lessened competition between Visa and MasterCard because it makes the Member Banks less willing to implement policies that would increase competition between Visa and MasterCard for the business of Merchants.  And as detailed in Part J below, Defendants instituted a number of ownership and control restrictions to preserve the banks' control, even after the IPOs.

222.    Because their memberships are virtually identical, the Networks and their Member Banks communicate frequently, exchange data, and coordinate much of their activity through joint programs and parallel activity.  Duality has also facilitated a high degree of uniformity in the

- 63 -

services offered by the competing Networks and the Merchant-Discount Fees charged by the Acquiring Banks to Merchants accepting Visa and MasterCard Credit Cards.

223. The Member Banks of the Networks can and do easily pass information among themselves, and with and between Visa and MasterCard. This practice has continued even after the Networks' IPOs.

224. The trend towards uniformity in pricing among dual Visa and/or MasterCard Member Banks has also been facilitated and exacerbated because - before the IPOs - Visa Member Banks collectively fixed the Visa Interchange Fees and contemporaneously, acting as MasterCard members, collectively fixed the MasterCard Interchange Fees. This trend toward uniformity in pricing has continued even after the IPOs.

225. Because the Member Banks that were represented on the Visa Board of Directors were all members of MasterCard before the IPOs, and issued MasterCard Payment Cards, they had a profit motive to ensure that MasterCard Interchange Fees increased in step with Visa Interchange Fees. As these banks continue to issue cards and acquire Merchants for the Networks, their incentive and ability to prevent competition between Visa and MasterCard continues.

226. Because the Member Banks that were represented on the MasterCard Board of Directors were virtually all members of Visa before the IPOs, they had a profit motive to ensure that Visa Interchange Fees increased in step with MasterCard Interchange Fees. As these banks continue to issue cards and acquire Merchants for the Networks, their incentive and ability to prevent competition between Visa and MasterCard continues.

227. The Member Banks of Visa have exacerbated the effects of duality by causing Visa to enact, publicize and adhere to a policy that Visa "will not be disadvantaged" on Interchange Fees vis-à-vis MasterCard and American Express. Similarly, the Member Banks of MasterCard have

caused MasterCard to adopt a policy of engaging in "competitive response" to increases in Visa's Interchange Fees by "matching" Visa's effective interchange rates, which guarantee that its Interchange Fees do not fall out of line with Visa's. By causing Visa and MasterCard to adopt these twin policies, the Member Banks have enabled the Networks to agree on levels of Interchange Fees to be paid by Merchants. Since the explicit adoption of these policies, the average effective interchange rates of Visa and MasterCard have been virtually identical. When the Banks, acting through Visa, adopted schedules of uniform Interchange Fees to be applied to all Visa transactions, they understood that the same Banks, acting through MasterCard, would match the effective Interchange Fees reflected in the Visa schedules.

228. The Networks are aware of each other's policies through communications with their dual Member Banks.

229. Because MasterCard knows that Visa's policy is to not be disadvantaged, it knows that Visa will match any Interchange Fee increase that it announces. Similarly, because Visa knows that MasterCard will make a "competitive response" to its Interchange Fee increases by "matching" those increases, it understands that its Interchange Fee will not place it at a competitive disadvantage for Merchant acceptance. Thus neither Visa nor MasterCard has an incentive to compete for Merchant acceptance based on Interchange Fee levels, and their Member Banks have the incentive to cause both Visa and MasterCard to continuously increase interchange fees. Industry-wide knowledge of the Visa and MasterCard policies has led the Banks and the Networks to a meeting of the minds that Visa and MasterCard will match each others' effective Interchange Fees.

230. Before Visa's public announcement in 2002 that it would not be competitively disadvantaged with respect to interchange, MasterCard's goal, as established by its management,

- 65 -

was to maintain an interchange effective rate across all products (consumer credit, commercial credit, and debit) that was 3-5 basis points (.03-.05%) higher than Visa's overall effective rate. After Visa's announcement, MasterCard's goal has been to achieve parity with Visa, not only on an overall effective rate basis, but also on a product basis (consumer credit, commercial credit, and debit). In fact, MasterCard has attempted to maintain parity with Visa even within segments of these product areas. For example, MasterCard's World card and Visa's Signature card are comparable "premium card" products within consumer credit. MasterCard and Visa have attempted to maintain parity on the overall effective interchange rate for these two products.

231. MasterCard and Visa not only establish matching effective interchange rates, but they also establish matching interchange rate structures. For example, both Visa and MasterCard have created four segments in their consumer credit group of products. Visa segments its consumer credit products into "traditional," "traditional with rewards," "Signature," and "Signature Plus." MasterCard has four similar segments, but they are called "core," "enhanced," "World," and "World Elite." These segments are based on the level of rewards associated with the product and the higher the level of rewards, the higher the interchange rate. Similarly, both Visa and MasterCard have created tiers within their interchange rate structures, whereby lower interchange rates apply to high volume Merchants and higher interchange rates apply to lower volume Merchants.

232. Therefore, virtually without exception, an Interchange Fee increase by either Visa or MasterCard is followed by a similar Interchange Fee increase by the other network. These collective acts are all manifestations of the effects of Duality.

233. But for the conspiracy among Visa, MasterCard, and their Member Banks, Visa and MasterCard would have had an incentive to decrease Interchange and Merchant-Discount Fees to

- 66 -

Merchants – in order to increase or promote Merchant acceptance of their respective Payment Cards.

234.    Duality has also facilitated a high degree of uniformity in the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints that the Networks impose on Merchants. This lack of significant non-price competition is evidence of collusion among the Defendants and maintains their monopoly power.

235.    A Visa transaction is indistinguishable from a MasterCard transaction.  The transactions utilize the same relationships among the same Member Banks to provide the same method of payment to Merchants.  Because of this identity between products, Visa and MasterCard and their Member Banks should principally compete for Merchant acceptance on price, including the price of Payment Card Interchange Fees, but they do not.

236.    The understanding between Visa and MasterCard is reinforced by both Networks' policies to discourage bilateral agreements between Issuers and Merchants.

237.    The understanding between Visa and MasterCard is further reinforced by both Networks' policies of discouraging competition between Visa and MasterCard for the provision of card-acceptance services to Merchants by, for example, discouraging the development of exclusive-acceptance and preferential-acceptance deals between Merchants and the Networks.

### G.    Visa and MasterCard Require the Payment of an Interchange Fee on all Transactions

238.    Prior to the IPOs, Bank Defendants, acting through the Visa and MasterCard Boards of Directors, collectively adopted and enforced rules that require the payment of an Interchange Fee, set at Visa and MasterCard's uniform levels, for all transactions on the respective Networks. Even after the IPOs, the Bank Defendants agree to abide by these rules.

239.    With respect to Visa, Operating Regulation 9.5 states that Visa's uniform schedule

- 67 -

of Interchange Fees "apply in all circumstances where Members have not set their own financial terms for the Interchange of Visa Transactions or where Visa has entered into confidential business arrangements to secure acceptance and promote Card usage."

240. Throughout the relevant time period, Visa has also enforced its longstanding "Honor All Cards" rule, embodied in Operating Regulation 5.2.B.3.a., which requires Merchants that accept Visa Payment Cards to accept all Visa cards within the "categories of acceptance" that it accepts, regardless of the identity of the issuing bank or the level of Interchange Fee it charges.

241. Similarly, Rule 9.1 of MasterCard's Bylaws and Rules requires Merchants that accept MasterCard-branded Payment Cards to "honor all valid MasterCard cards without discrimination when properly presented for payment."

242. And as with Visa's Operating Regulations, Rule 10.4 of MasterCard's Bylaws and Rules requires the payment of MasterCard's uniform schedule of default Interchange Fees on all MasterCard transactions.

243. Even after the corporate restructuring described in Part Five below, these uniform schedules of Interchange Fees were collectively agreed upon by MasterCard's Member Banks. For example, in April 2007, MasterCard Rule 10.5 stated that "[t]he interchange fee applied to intracountry transactions is called an intracountry interchange fee and shall be the fee agreed to by members doing business within the country. Furthermore, in October 2008, Rule 9.5 allowed default intracountry Interchange Fees to be established "by agreement of Member [Banks] in the country as set forth in Rule 9.5.1" or through "application of intraregional interchange and service fees to Intracountry Transactions and intracountry cash disbursements as set forth in Rule 9.5.2."

244. By enacting and enforcing the "Honor All Cards" and Interchange Fee payment rules noted above, the Defendants have created a situation in which the payment of an Interchange

- 68 -

Fee is required on all transactions, regardless of the Issuing Bank. Because of this problem – a problem entirely of Defendants' own creation – Defendants now claim that uniform schedules of "fall back" Interchange Fees actually benefit Merchants by preventing the Issuing Bank from "holding up" the Merchant by demanding an Interchange Fee that is as high as the Issuer would like, knowing that the Honor All Cards rule prevents the Merchant from refusing that transaction.

245.     But for the rules described in this section, Merchants would have the option to reject a given Visa or MasterCard payment card for a given transaction if the benefit the Merchant receives from accepting the card or allowing the transaction is not commensurate with the associated Merchant fee.

### H.     The Practices Described Above Harm Competition

246.     The rules requiring the payment of Interchange Fees on every transaction, the collective setting of uniform schedules of Interchange Fees, and the continued imposition of these fees on all Merchants that accept Visa and MasterCard Payment Cards restrains competition between Visa and MasterCard Member Banks in the markets for General Purpose Card Network Services, Offline Debit Card Network Services and PIN-Debit Card Network Services. This harms competition by imposing large and ever-increasing Interchange Fees, which thereby elevates Merchant-Discount Fees to supracompetitive levels.

247.     The Anti-Steering Restraints harm competition by allowing Defendants to insulate themselves from competition from lower-priced General Purpose Card and Debit Card Network Service providers, by inflating prices for all consumers, by compelling inequitable subsidies that affect the least-affluent U.S. consumers, and by allowing Defendants to continue their practices of collectively fixing supracompetitive, uniform Interchange Fees.

248.     The damages suffered by the Class Members accumulate and increase with each

- 69 -

passing day that Defendants' anticompetitive practices are allowed to continue. These damages will continue to increase during the pendency of this suit until halted by Court Order.

> **I.    Experiences from Outside of The United States Demonstrate that Rules Requiring the Payment of Interchange Fees on Every Transaction and Collectively Set and Supracompetitive Interchange Fees are Not Necessary to the Functioning of a Payment Card Network**

249.    Competition and regulatory authorities in several jurisdictions around the globe have concluded that Visa and MasterCard's collectively-fixed uniform schedule of Interchange Fees and other restraints are anticompetitive and illegal.

250.    For example, the European Commission ("E.C.") ruled on December 19, 2007 that MasterCard's cross-border Interchange Fee violates Article 81(1) of the E.C. Treaty, its counterpart to Section 1 of the Sherman Act.

251.    In its 241-page decision, the E.C. rejected each of the arguments that Defendants have attempted to make in this litigation, including that the Networks' IPOs absolved them of continuing Section 1 liability, that the relevant market is broader than Payment Cards, and that rules requiring the payment of Interchange Fees on every transaction and collectively-fixed, uniform schedules of Interchange Fees are necessary to the functioning of a four-sided Payment Card Network.

252.    Under the E.C.'s decision, MasterCard was ordered to cease and desist from its anticompetitive conduct, including its enforcement of its rule requiring the payment of Interchange Fees on all cross-border European transactions.

253.    On March 25, 2008, the E.C. announced that it was launching an antitrust investigation into the setting of Visa's cross-border Interchange Fees, which Visa announced that it intended to settle with the E.C.

254.    Similarly, in 2005 the antitrust-enforcement body in the United Kingdom, the Office

of Fair Trading ("OFT"), concluded after a four-year investigation, that MasterCard's domestic Interchange Fees violated the U.K. equivalent to Section 1 of the Sherman Act.

255.    In addition to finding that MasterCard had market power in the relevant markets for Payment-Card issuance, acquiring and a "wholesale" market, the OFT also found that the Interchange Fee was used to extract extraneous costs – i.e., those not necessary to the functioning of a Payment Card network.  Two of the "extraneous costs" found by the OFT, the cost of "rewards" and the cost of the interest-free "float" period, are often held up by Defendants as examples of costs that justify the imposition of uniform schedules of Interchange Fees on Merchants.

256.    The Reserve Bank of Australia ("RBA") has also extensively investigated its domestic Payment Card industry.  In 2002, as a result of that investigation, the RBA ordered Visa and MasterCard to reduce domestic Interchange Fees by nearly half, from an average of 95 basis points (.95%) before the reforms to approximately 50 basis points today.

257.    Before the RBA's reforms, the Networks predicted that any significant reduction in Interchange Fees would lead to disaster, with MasterCard going so far as to assert that the reforms would initiate a "death spiral" that would lead to the collapse of both Payment Card issuance and acceptance.

258.    Contrary to the Networks' doomsday speculations, however, the Payment-Card market in Australia prospers after the reforms.  The data since the reforms indicate that card issuance and transaction volumes are up, total costs to Merchants and cardholders have gone down, and banks remain profitable.

259.    Experiences from other countries with Payment Card networks that function with zero or minimal Interchange Fees place the final nails in the coffin of the "death spiral" argument.

- 71 -

260.    For example, debit card systems in Canada, Norway, Finland, Germany, Denmark, The Netherlands, and Australia function effectively without Interchange Fees, which are real-world examples of how the Defendants' uniform schedule of Interchange Fees are not necessary to the functioning of a Payment-Card Network.

**J.    Defendants Attempt to Avoid the Antitrust Laws Through Reorganizing into Purported "Single Entities"**

261.    The allegations contained in Class Plaintiffs' First Amended Class Action Complaint dated January 29, 2009 and Class Plaintiffs' Second Supplemental Class Action Complaint also dated January 29, 2009, are incorporated and as though fully set forth herein.

262.    After being adjudicated "structural conspiracies" in the United States, the European Union, the United Kingdom, and several other jurisdictions, the Networks took steps to restructure themselves in an attempt to remove their Interchange Fee setting and other conduct from Section 1 of the Sherman Act and equivalent laws in foreign jurisdictions that prohibit agreements among competitors.

263.    For example, in May 2005, MasterCard's then-CEO Robert Selander noted in a presentation to the European banks that were then represented on MasterCard's Board of Directors that through an IPO, MasterCard wished to terminate the "structural conspiracy previously found to exist by courts in the United States."

264.    By that time, MasterCard had already attempted to reduce its, and its Member Banks', antitrust exposure for the setting of Interchange Fees.  In July of 2004, for example, the MasterCard Board of Directors vested in management the right to establish uniform schedules of default Interchange Fees for the United States.  Similar to MasterCard's later restructuring efforts, however, this delegation had the effect of appointing an agent to set equally supracompetitive Interchange Fees, by which each of MasterCard's Member Banks would agree to abide.

- 72 -

265.     On May 22, 2006, MasterCard completed an Initial Public Offering ("IPO"), which sold a partial interest in MasterCard to public investors. Through this IPO and related agreements, the surviving entity (hereinafter "New MasterCard") acquired certain of its Member Banks' ownership and control rights in MasterCard through the redemption and reclassification of stock that was previously held by the Member Banks into non-voting "Class B" shares in New MasterCard. In addition, the Member Banks each received a single "Class M" share that allowed them to elect up to 25% of the New MasterCard board and gave them veto power over certain of New MasterCard's competitive decisions.  New MasterCard financed this acquisition by selling to the public  "Class A" shares, which represented a 41% equity interest in New MasterCard.  The Class B shares that are held by the Member Banks constitute 49% of the equity interest in New MasterCard. A newly-created New MasterCard Foundation was given a 10% equity share in New MasterCard.

266.     Leading up to and at the time of the IPO, MasterCard and its Member Banks executed several related agreements, which ensured that the banks would retain significant control over New MasterCard's competitive decisions and prevent New MasterCard from becoming a legitimate competitor to the banks' and Visa's market power in the relevant market. For example, MasterCard and its Member Banks enacted a restriction that limited any one shareholder or group of shareholders from acquiring more than a 15% equity interest in New MasterCard. This restriction prevents an investor (for example, a Merchant or group of Merchants) from acquiring a controlling stake in New MasterCard and deciding to operate it as a low Interchange Fee competitor to Visa.

267.     In addition, the Class M shareholders –*i.e.,* the Member Banks—acquire the right to block New MasterCard from being acquired or exiting its "core business." This restriction thereby

- 73 -

prevents New MasterCard from engaging in other activities that would jeopardize the banks' supracompetitive Interchange Fee revenues.

268.    Through the IPO, MasterCard and its Member Banks intended to preserve its ability to impose supracompetitive fees on Merchants for accepting MasterCard Payment Cards without the proscriptions of Section 1 of the Sherman Act. For example, after the IPO, New MasterCard could impose a card-acceptance fee on Merchants and use the proceeds of that fee to provide kickbacks to Issuing Banks for issuing MasterCard Payment Cards, thereby effectively re-establishing the Interchange Fee, in a way that New MasterCard argues cannot be checked by Section 1. And because New MasterCard has market power in the Relevant Market, it can impose supracompetitive card-acceptance fees on Merchants.

269.    On March 19, 2008, Visa completed its own IPO. Under a series of transactions that culminated in the IPO, Visa U.S.A., Visa International, Visa Canada, and Inovant (but not Visa Europe) became subsidiaries of a Delaware corporation known as Visa, Inc. (hereinafter "New Visa" or "Visa, Inc.").  After the subsidiaries were unified in Visa, Inc., the stock was acquired in the former members of each subsidiary. Once the restructuring was completed, Visa, Inc. conducted an Initial Public Offering of over 400,000,000 shares of class A common stock. This process is essentially the acquisition by Visa Inc. of certain Member Banks' ownership rights in Visa through the redemption and reclassification of approximately 270 million shares of Visa stock previously held by the Member Banks in the form of Class B and Class C common stock.

270.    Avoidance of antitrust liability is a significant motivation to Visa's restructuring efforts. In light of the parallels to the MasterCard IPO and the fact that Visa's IPO was conducted during the pendency of this litigation lead to the inescapable conclusion that Visa's intent was also to attempt to shield its conduct in the setting of fees for the Merchants that accept its Payment

- 74 -

Cards from antitrust liability.

## PART TWO: ALLEGATIONS RELATING TO CREDIT-CARD CLAIMS

## IX.

### RELEVANT MARKETS

271. A relevant market exists, the product dimension of which is no broader than General Purpose Cards. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001). The geographic dimension of this market is the United States ("General Purpose Card Market"). *United States v. Visa*, 163 F. Supp. 2d at 339-40 (S.D.N.Y. 2001), *aff'd*, 344 F.3d at 239 (2d Cir. 2003).

272. A relevant market exists, the product dimension of which is no broader than General Purpose Card Network Services. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 F. Supp. 2d at 338, *aff'd*, 344 F.3d at 239. The geographic dimension of this market is the United States ("General Purpose Card Network Services Market").

273. Both Visa and MasterCard, "together with their Member Banks," jointly and separately, have market power in the market for General Purpose Cards and General Purpose Card Network Services. *United States v. Visa*, 163 F. Supp. 2d at 340, *aff'd*, 344 F.3d at 239.

274. The market shares of Visa and MasterCard indicate that each has market power in the General Purpose Card Network Services market. In 1999, Visa had a 47% share of the General Purpose Card transactions by dollar volume in the United States, while MasterCard's share was 26%. Visa and MasterCard had a combined market share of 73%. *United States v. Visa*, 163 F. Supp. 2d at 341. At that time, Visa and MasterCard collectively issued 85% of the General Purpose Cards in the United States. *Id.*

275. In 2007, Visa transactions accounted for 43% of U.S. General Purpose Card

- 75 -

purchase volume, which included American Express, and Discover. Visa's market share is significantly higher if Charge Cards are excluded from the market.

276.    In 2007, MasterCard transactions accounted for 29% of all General Purpose Card purchase volume in the United States. Again, this figure would be even higher if Charge Cards were excluded from the market. As was the case seven years earlier when Judge Jones decided that Visa and MasterCard possessed market power, Visa and MasterCard collectively accounted for 71% of General Purpose Card purchase volume in 2007.

277.    Concerted activity between Visa and MasterCard allows the Networks to collectively assert market power. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) (noting evidence of collusion between Visa and MasterCard with respect to their Debit Card strategies).

278.    Merchants do not view Offline Debit Card Network Services and PIN-Debit Card Network Services as acceptable substitutes to Credit Card Network Services. This is demonstrated by the fact that Merchants continue to accept Visa and MasterCard Credit Cards even though the Interchange Fees associated with Credit Card transactions is significantly higher than the fees associated with Debit Card transactions.

279.    More recently, both Visa and MasterCard have increased Interchange Fees by large amounts without losing any Merchants as a result.

280.    None of the recent increases in Visa and MasterCard's Credit Card Interchange Fees have been attributable to increases in the level of costs associated with the operations of the Networks.

281.    Visa and MasterCard have exercised their market power in the General Purpose Card Network Services market. As the court noted in the United States' action against the

- 76 -

Networks, Visa and MasterCard raised Credit Card Interchange Fees charged to Merchants a number of times without losing Merchants. *United States v. Visa*, 163 F. Supp. 2d at 340. Visa and MasterCard continue their practice of increasing Interchange Fees, again without losing significant Merchant acceptance.

282. Visa and MasterCard have also demonstrated their market power by "price discriminating" in the level of Interchange Fees imposed on various Merchants and for various types of transactions. *United States v. Visa*, 163 F. Supp. 2d at 340. Since the United States' action, Visa and MasterCard have only increased their price-discrimination practices.

283. The Networks' price-discrimination among categories of Merchants is not based on cost but is based instead on the Networks' perception of the "elasticity of demand" (*i.e.*, the Merchants' willingness to pay) of the various categories of Merchants. The Networks' practice is to impose the highest fees on those Merchants that have the fewest options to discontinue acceptance when fees increase.

284. The Networks' pricing policies are reflected in the comments of MasterCard's Associate General Counsel before the European Commission in 2007. The Associate General Counsel discussed that when MasterCard performs a cost study, it attempts to answer the following question: "How high could interchange fees go before we would start having serious acceptance problems, where Merchants would say: we don't want this product anymore, or by Merchants trying to discourage the use of the card either by surcharging or discounting for cash." European Commission, Commission Decision of December 19, 2007 Relating to a Proceeding Under Article 81 of the EC Treaty and Article 53 of the EEA Agreement (COMP/34.579; COMP 36.518; COMP 58.580) at 56.

285. Similarly, Visa determines the level of Credit Card Interchange Fees that it imposes

- 77 -

on various categories of Merchants based on the elasticity of demand of those Merchants.

286.    Visa and MasterCard have also forced Premium Credit Cards upon Merchants that accept Visa and MasterCard Credit Cards.  These Premium Cards carry higher Interchange Fees than non-premium cards and many Merchants would refuse to accept them if they had the power to do so.  Visa and MasterCard rules require Merchants that accept Visa and MasterCard Credit Cards to also accept these "Premium Cards."  The inability of Merchants to resist the imposition of higher Interchange Fee cards further demonstrates Visa and MasterCard's market power.

287.    There are significant barriers to entry in the General Purpose Card Network Services Market.  Because of these barriers, the only successful market entrant since the 1960's has been Discover, which was introduced by Sears and benefited from its extensive network of stores, its extensive base of customers who carried Sears' store card, and its relationship with Dean Witter. New entry into the General Purpose Card Network Services Market would cost more than 1 billion dollars and would involve a "chicken-and-egg problem of developing a Merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce Merchants to accept the system's cards in the first place."  *United States v. Visa*, 163 F. Supp. 2d at 342.

288.    Visa and MasterCard's substantial (individual and collective) market power in the General Purpose Card and Debit Card Network Services Markets has been reinforced by their implementation and enforcement of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints, which insulate them from competition that would exist in a free market.

289.    The evidence at trial may also establish that the markets relevant for the provision of Network Services are narrower "single brand" markets, *i.e.* a market for the processing of Visa Payment Card transactions, and a market for the processing of MasterCard Payment Card transactions.

290.     Single-brand markets may exist because, from a Merchant's perspective, the acceptance of Visa Payment Card transactions does not substitute for the acceptance of MasterCard Payment Card transactions and vice versa. When a consumer presents a Visa Payment Card to a Merchant, for example, the Merchant cannot accept that transaction unless it has an agreement with a Visa Member Bank to acquire Visa transactions. An agreement with a MasterCard Member Bank to process MasterCard transactions does not provide the Merchant with the services it needs to process this Visa transaction.

291.     As former Federal Trade Commission Chairman (and Visa's paid consultant) Tim Muris noted, "[m]ost Merchants cannot accept just one major card because they are likely to lose profitable incremental sales if they do not take the major payment cards. Because most consumers do not carry all of the major payment cards, refusing to accept a major card may cost the Merchant substantial sales." Timothy J. Muris, Payment Card Regulation and the (Mis)application of the Economics of Two-Sided Markets, 2005 Colum. Bus. L. Rev. 515, 522 (2005).

## FIRST CLAIM FOR RELIEF:
### CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1 UNLAWFUL PRICE FIXING OF CREDIT CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS

292.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

293.     Visa and its Member Banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1.

294.     The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and

- 79 -

acquiring members including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit Card Interchange Fees that are imposed on Merchants in the market for General Purpose Card Network Services.

295.    The Visa Board of Directors, which included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

296.    All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

297.    The contract, combination, conspiracy, and agreement alleged in this First Claim has had, and/or is likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

a.    Actual and potential competition in the General Purpose Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b.    Defendants acquired and maintained market power in the relevant markets of General Purpose Card and General Purpose Card Network Services;

c.    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Class Members in the market for General Purpose Card Network Services;

d.    All Class members were required to pay supracompetitive Credit Card Interchange Fees for Visa transactions in the market for General Purpose Card Network Services;

e.    Defendants derived direct and substantial economic benefits from the supracompetitive Credit Card Interchange Fees for Visa transactions in the market for General Purpose Card Network Services;

f.    But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the market for General Purpose Card Network Services; and

- 80 -

g. The specific amount of damages suffered by Class I have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

298. The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few — if any —procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General Purpose Card Network Services market. The supra-competitive levels of Interchange continue to the present date.

## SECOND CLAIM FOR RELIEF:
**CLASS I VS. MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF CREDIT CARD INTERCHANGE FEES BY MASTERCARD AND ITS MEMBER BANKS**

299. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

300. MasterCard and its Member Banks, including Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

301. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, including Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit-Card Interchange Fees that are imposed on Merchants in the market for General Purpose Card Network Services.

- 81 -

302. The MasterCard Board of Directors, which included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

303. All of the Member Banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

304. The contract, combination, conspiracy, and agreement alleged in this Second Claim has had, and/or is likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

   a. Actual and potential competition in the General Purpose Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

   b. Defendants acquired and maintained market power in the relevant markets of General Purpose Card and General Purpose Card Network Services;

   c. Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Class Members in the market for General Purpose Card Network Services;

   d. All Class members were required to pay supracompetitive Credit Card Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services;

   e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit Card Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services;

   f. But for the anticompetitive conduct of MasterCard and its Member Banks, competition among MasterCard's Member Banks would have eliminated or greatly reduced the Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services; and

   g. The specific amount of damages suffered by Class I have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens

- 82 -

of billions of dollars.

305.    The collectively fixed Interchange Fees are illegal.  They are not necessary to accomplish any procompetitive benefits of the MasterCard Network.  Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. MasterCard and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General Purpose Card Network Services market. The supra-competitive levels of Interchange continue to the present date.

### THIRD CLAIM FOR RELIEF:
**CLASS I VS. VISA AND MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF THE SHERMAN ACT, § 1, UNLAWFUL PRICE FIXING OF CREDIT CARD INTERCHANGE FEES BETWEEN AND AMONG DEFENDANTS VISA AND MASTERCARD AND THEIR MEMBER BANKS**

306.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

307.    Visa and MasterCard, together with Bank Defendants and other Member Banks, have colluded with the purpose to, and the effect of, fixing, raising, maintaining, or stabilizing Credit Card Interchange Fees in the market for General Purpose Card Network Services at similar supracompetitive levels, and have agreed not to reduce such Interchange Fees.

308.    Visa and MasterCard consciously engaged in parallel conduct at the direction of the Bank Defendants with respect to Interchange Fees and other conduct that supports the inference of the above-described agreement.  In addition to consciously-parallel conduct, the Defendants' conduct exhibits the following "plus factors," among others, which support an inference of the existence of the above-described agreement:

- 83 -

a.    Many of the same Member Banks issue both Visa and MasterCard Payment Cards, which provides fertile ground for collusion between the two Networks. A high level of communication regarding Interchange Fees, other fees, and promotions exists between and among Visa and MasterCard, both directly and through the Bank Defendants and other dual Member Banks;

b.    The Interchange-Fee-setting activities of Visa are transparent to MasterCard and its Member Banks and vice versa;

c.    The Network Services that Visa, MasterCard, and their Member Banks provide to Merchants are indistinguishable from each other;

d.    Credit-Card Interchange Fees for both Visa and MasterCard move in parallel and stair-step fashion. Virtually without exception, an increase in Interchange Fees by one Association was met with an increase by the other;

e.    The Bank Defendants and other Member Banks of Visa and MasterCard have a profit motive to ensure that the Interchange Fees of both Networks increase in parallel and stair-step fashion;

f.    But for the conspiracy between Visa and MasterCard, neither Network would have had an incentive to match a price increase by the other Network; and

g.    Both Visa and MasterCard each have substantial market power and have the incentive and ability to maintain Interchange Fees at supracompetitive levels to protect their profits from competition from each other.

h.    The Member Banks of Visa and MasterCard have caused each Network to adopt the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints. The effect of these Restraints is such that the usual competitive mechanism of sellers offering a lower price to generate more sales is ineffective. Thus, Visa, MasterCard and their Member Banks have structured the market such that there is no incentive for Issuers to offer Merchants lower Interchange Fees

i.    Both Visa and MasterCard have instituted, announced and publicized policies that they will not be "competitively disadvantaged" with respect to Interchange Fees, which provides assurances to each Network that an Interchange Fee increase by it will be met by an equally substantial increase by the other Network.

309.    Visa, MasterCard, the Bank Defendants, and their Co-Conspirators achieved their anticompetitive objectives, in part, by agreeing, separately and together, to establish, implement,

- 84 -

and maintain a price-fixing scheme whereby they fixed supracompetitive Credit-Card Interchange Fees in the market for General Purpose Card Network Services.

310. The conspiracy by Visa and MasterCard to fix, raise, maintain or stabilize the price of Credit Card Interchange Fees to be imposed on Merchants in the market for General Purpose Card Network Services has had, and/or is likely to have, among others, the following intended and actual anticompetitive effects, which are common to the entire Class of Plaintiffs:

a. Actual and potential competition in the General Purpose Card Network Services markets was substantially excluded, suppressed, and effectively foreclosed;

b. Defendants acquired and maintained market power in the relevant markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Credit-Card Interchange Fees imposed on Plaintiffs and Class members for General Purpose Card Network Services;

d. All Class members were required to pay supracompetitive Credit-Card Interchange Fees to Issuing Banks in the market for General Purpose Card Network Services;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees charged to Merchants; and

f. The specific amount of damages suffered by Class I have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

311. As a consequence of the Defendants' illegal conduct, Plaintiffs and Class Members suffered a common injury to their business and property, in part, because higher Credit Card Interchange Fees and Merchant-Discount Fees were imposed on them in the market for General Purpose Card Network Services than they would have paid in the absence of the Defendants' anticompetitive conduct.

312. These restraints on competition alleged in this Third Claim for Relief are illegal *per*

- 85 -

*se*.  They are not reasonably related to the operations of the Visa and MasterCard networks, and even if they were reasonably necessary, they are broader than necessary to effectuate the business of Visa and MasterCard.  The supra-competitive levels of Interchange continue to the present date.

<u>FOURTH CLAIM FOR RELIEF:</u>

**CLASS I V. VISA AND BANK DEFENDANTS FOR VIOLATION OF THE CARTWRIGHT ACT, § 16700 *ET SEQ*. OF THE CALIFORNIA BUSINESS AND PROFESSIONAL CODE, UNLAWFUL PRICE FIXING OF CREDIT CARD INTERCHANGE FEES**

313.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

314.    Until its reorganization and IPO, Visa and its Member Banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code, § 16700 *et seq.*).  These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

315.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit Card Interchange Fees charged to Merchants by Issuing Banks in the market for General Purpose Card Network Services.

316.    The Visa Board of Directors, which included representatives from several Bank Defendants, voted to fix, raise, maintain, or stabilize the Credit Card Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

317.    All of the Member Banks of Visa, including the Bank Defendants, have had actual

- 86 -

knowledge of, and have knowingly participated in, the conspiracy alleged herein.

318. The contract, combination, conspiracy, and agreement has had, and/or is likely to have, among other things, the following anticompetitive effects which are common to the entire Class of Plaintiffs:

a. Actual and potential competition in the General Purpose Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b. Visa acquired and maintained market power in the relevant markets of General Purpose Card and General Purpose Card Network Services;

c. Defendants controlled, maintained, and elevated above competitive levels the Credit-Card Interchange Fees imposed on Class members in the market for General Purpose Card Network Services;

d. Class members were required to pay supracompetitive Interchange Fees;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees in the market for General Purpose Card Network Services;

f. But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Credit-Card Interchange Fees in order to gain business from Merchants; and

g. But for the anticompetitive conduct of Defendants, Class Members would have saved tens of billions of dollars by avoiding to pay collectively fixed Interchange Fees.

319. The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Card Network Services market.

- 87 -

320.    As a consequence of Visa's and its Member Banks' illegal combinations and conspiracies in violation of the Cartwright Act, Class Members suffered a common injury to their business and property, in part, because they were charged higher Credit Card Interchange Fees by Issuing Banks in the market for General Purpose Card Network Services than they would have paid in the absence of the Defendants' conduct.  The specific amount of damages suffered by Class Members have not yet been determined, as such determination will require additional discovery and expert analysis. The supra-competitive levels of Interchange continue to the present date.

## FIFTH CLAIM FOR RELIEF:
**CLASS II VS. ALL DEFENDANTS FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT 15 U.S.C. § 26 FOR VIOLATIONS OF THE SHERMAN ACT, § 1, AND THE CARTWRIGHT ACT, BY DEFENDANTS VISA AND MASTERCARD AND THEIR MEMBER BANKS**

321.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

322.    Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendants' continuing price fixing of Credit Card Interchange Fees in violation of Section 1 of the Sherman Act and the Cartwright Act, as described in this Complaint, including the First through Fourth Claims.

323.    Defendants' conduct described above is likely to continue if not enjoined.

324.    Plaintiffs request a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that Defendants' aforementioned conduct constitutes unlawful price fixing of Interchange Fees, as detailed in the First through Fourth Claims and in violation of Section 1 of the Sherman Act and the Cartwright Act.

325.    Plaintiffs further request that the Court enjoin and restrain Defendants' wrongful

- 88 -

conduct, alleged herein, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

## SIXTH CLAIM FOR RELIEF:
**CLASS II VS. VISA AND BANK DEFENDANTS FOR INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT, 15 U.S.C. § 26, FOR VIOLATION OF SHERMAN ACT § 1 UNREASONABLE RESTRAINT OF TRADE BY VISA AND ITS MEMBER BANKS IN IMPOSING AND ENFORCING ANTI-STEERING RESTRAINTS**

326.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

327.    Visa has and exercises market power in the relevant markets of General Purpose Card and General Purpose Card Network Services.

328.    The No-Surcharge Rule and the other Anti-Steering Restraints, imposed upon Merchant plaintiffs by Visa and its Member Banks, represent an unlawful contract in restraint of trade in violation of Sherman Act Section 1.

329.    In addition, the collective adoption and enforcement of the No-Surcharge Rule and the other Anti-Steering Restraints by Visa and its Member Banks constitute a contract, combination, or conspiracy in unreasonable restraint of trade.

330.    The Anti-Steering Restraints (and particularly the No-Surcharge Rule) are anticompetitive vertical restraints.  Among their anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low-cost payment media to users of Defendants' high-cost payment media, the entrenchment of Defendants' market positions, and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient Payment Card services.

331.    No procompetitive justifications exist for the Anti-Steering Restraints.

332.    As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Restraints, Class Members have suffered injury to their business and property.

- 89 -

333.    Defendants' conduct described herein is likely to continue if not enjoined.

## SEVENTH CLAIM FOR RELIEF:

**CLASS II VS. MASTERCARD AND BANK DEFENDANTS FOR INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT, 15 U.S.C. § 26, FOR VIOLATION OF SHERMAN ACT § 1 UNREASONABLE RESTRAINT OF TRADE BY MASTERCARD AND ITS MEMBER BANKS IN IMPOSING AND ENFORCING ANTI-STEERING RESTRAINTS**

334.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

335.    MasterCard has and exercises market power in the relevant markets of General Purpose Card and General Purpose Card Network Services.

336.    The No-Surcharge Rule and other Anti-Steering Restraints, imposed upon Merchant plaintiffs by MasterCard and its Member Banks, represent an unlawful contract in restraint of trade in violation of Sherman Act Section 1.

337.    In addition, the collective adoption and enforcement of the No-Surcharge Rule and other Anti-Steering Restraints by MasterCard and its Member Banks constitute a contract, combination, or conspiracy in unreasonable restraint of trade.

338.    The Anti-Steering Restraints (and particularly the No-Surcharge Rule) are anticompetitive vertical restraints.  Among their anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of Defendants' high cost payment media, the entrenchment of Defendants' market positions and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient Payment Card services.

339.    No procompetitive justifications exist for the Anti-Steering Restraints.

340.    As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Restraints, Class Members have suffered injury to their business and property.

- 90 -

341. Defendants' conduct described herein is likely to continue if not enjoined.

**EIGHTH CLAIM FOR RELIEF:**
**CLASS II VS. VISA AND BANK DEFENDANTS FOR INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT, 15 U.S.C. § 26, FOR VIOLATION OF SHERMAN ACT § 2 MONOPOLIZATION BY VISA AND ITS MEMBER BANKS**

342. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

343. Visa has monopoly power in the relevant markets of General Purpose Card and General Purpose Card Network Services.

344. The Anti-Steering Restraints further and protect Visa's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient Credit Card Network Services to Merchants. The adoption, imposition, and enforcement of the Anti-Steering Restraints constitute willful maintenance of monopoly power, which harms the competitive process and consumers, in violation of Section 2 of the Sherman Act.

345. No procompetitive justification exists for the No-Surcharge Rule in particular or the Anti-Steering Restraints in general.

346. As a direct and foreseeable result of Visa's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Restraints, Plaintiffs and Class Members have suffered threatened and actual injury to their business and property.

347. As a direct and foreseeable result of Visa's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Restraints, Plaintiffs and Class Members have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law.

348. Visa's monopolization occurred in and affected interstate commerce.

349. The conduct described herein is likely to continue unless enjoined.

### NINTH CLAIM FOR RELIEF:
### CLASS II VS. MASTERCARD AND BANK DEFENDANTS FOR INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT, 15 U.S.C. § 26. FOR VIOLATION OF SHERMAN § 2, MONOPOLIZATION BY MASTERCARD AND ITS MEMBER BANKS

350. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

351. MasterCard has monopoly power in the relevant markets of General Purpose Card and General Purpose Card Network Services.

352. The Anti-Steering Restraints further and protect MasterCard's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient Credit Card Network Services to Merchants. The adoption, imposition, and enforcement of the Anti-Steering Restraints constitute willful maintenance of monopoly power, which harms the competitive process and consumers, in violation of Section 2 of the Sherman Act.

353. No procompetitive justification exists for the No-Surcharge Rule in particular or the Anti-Steering Restraints in general.

354. As a direct and foreseeable result of MasterCard's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Restraints, Plaintiffs and Class Members have suffered threatened and actual injury to their business and property.

355. As a direct and foreseeable result of MasterCard's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Restraints, Plaintiffs and Class Members have suffered and continue to suffer

irreparable injury for which there is no adequate remedy at law.

356.    MasterCard's monopolization occurred in and affected interstate commerce.

357.    The conduct described herein is likely to continue unless enjoined.

## PART THREE: ALLEGATIONS RELATING TO OFFLINE DEBIT CARD CLAIMS

### X.

### OFFLINE DEBIT CARD RELEVANT MARKETS

358.    A relevant market exists, the product dimension of which is Offline Debit Cards.  The geographic dimension of this market is the United States.

359.    In the alternative, a relevant market exists, the product dimension of which is no broader than Debit Cards.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003).

360.    A relevant market exists, the product dimension of which is Offline Debit Card Network Services.  In addition, the evidence at trial may establish that "single-brand" markets exist for the processing of Visa Offline Debit Card Network Services and MasterCard Offline Debit Card Services.  The geographic dimension of this market is the United States.  The evidence may also establish that "single-brand" markets exist in the market as well.

361.    In the alternative, a relevant market exists, the product dimension of which is no broader than Debit Card Network Services. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *7 (E.D.N.Y. Apr. 1, 2003).

362.    Offline Debit Cards and Offline Debit Card Network Services are a unique bundle of services.  Consumers who use Offline Debit Cards either want to or have to make contemporaneous payment for their purchases with funds in their depository accounts.  These consumers either cannot borrow money for those purchases (because they may not be deemed

credit-worthy by Credit Card Issuing Banks) or choose not to.

363.    From a consumer's perspective, Offline Debit Cards are not interchangeable with PIN-Debit Cards.  Offline Debit Cards carry a Visa or MasterCard "Bug" and therefore are accepted by virtually all Merchants that accept Visa and MasterCard Payment Cards.  On the other hand, PIN-Debit Cards are accepted at many fewer Merchant locations and therefore a consumer who prefers to pay for purchases with a PIN-Debit Card must necessarily carry an alternate form of payment as well.

364.    Because Offline Debit Cards uniquely enable consumers to make certain types of purchases, the acceptance of Offline Debit Cards is also unique from a Merchant's perspective. Therefore no other services exist that are reasonably substitutable for Offline Debit Card Network Services.

365.    PIN-Debit transactions require a PIN pad and are not processed by a paper receipt.  This means that a greater upfront cost exists to the Merchant of accepting PIN transactions, and in some situations, the use of a PIN-Debit Card may require a change in business procedures.  For example, in a restaurant, if customers did not pay at a central location, the server would have to bring a wireless PIN pad to the table.  These practices are common in countries in which Zero-Interchange-Fee PIN-Debit Card Networks are well-established.

366.    Visa and MasterCard have market power in the market for Offline Debit Card Network Services.  In 2007, Visa's Offline Debit Card product had a 74% share of the purchase volume in the Offline Debit Card market.  MasterCard's share of the Offline market was 26%.

367.    Visa and MasterCard's market power in the Offline Debit Card and Offline

- 94 -

Debit Card Network Services markets is reinforced by the fact that the major Visa-Check-Issuing Banks are members of MasterCard and major MasterCard-Debit-Issuing Banks are members of Visa. This makes the Interchange Fee structures between Visa and MasterCard transparent to them and minimizes the incentives of the Networks to undercut each other's fees. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at \*3, \*6 (E.D.N.Y. Apr. 1, 2003) (citing incidents of concerted activity between Visa and MasterCard).

368. Few, if any, Merchants would stop accepting Visa or MasterCard Offline Debit Cards even in the face of a substantial increase in Merchant-Discount Fees. In fact, even after the settlement in *In re: Visa Check* allowed Merchants to refuse acceptance of Defendants' Offline Debit Cards while continuing to accept Defendants' Credit Cards, few Merchants have actually availed themselves of this opportunity.

369. Barriers to entry in the Debit Card market and the Debit Card Network Services market are high. No major competitors have emerged to challenge Defendants' dominance of those markets since Defendants began attempting to grow their Offline Debit Card volume in the early 1990s. New entrance into these markets would be costly and would involve the "chicken-and-egg" problem of signing up both Card-Issuing banks and Merchants for the network. Visa has entered into exclusive business arrangements with many Member Banks which are designed to further raise entry barriers.

370. Visa and MasterCard's substantial (individual and collective) market power in the General Purpose Card Network Services and Offline Debit Card Network Services markets has been further reinforced by their implementation and enforcement of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints, which insulate them from the

- 95 -

competition that would otherwise exist in a free market.

**TENTH CLAIM FOR RELIEF:**

**CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF OFFLINE DEBIT CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS**

371.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

372.    Throughout the relevant period, Visa and its Member Banks, including the Bank Defendants — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

373.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Offline Debit Card Interchange Fees imposed on Merchants in the market for Offline Debit Card Network Services.

374.    The Visa Board of Directors, which includes representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa Offline Debit Card transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

375.    All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

376.    The contract, combination, conspiracy, and agreement alleged in this Claim has, had, and/or is likely to have, among others, the following anticompetitive effects which

- 96 -

are common to Plaintiffs and Class Members:

    a.    Actual and potential competition in the Offline Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

    b.    Defendants acquired and maintained market power in the relevant markets of Offline Debit Card and Offline Debit Card Network Services;

    c.    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to Class Members in the market for Offline Debit Card Network Services;

    d.    Defendants imposed supracompetitive Offline Debit Card Interchange Fees on all Class Members for Visa transactions in the market for Offline Debit Card Network Services;

    e.    Defendants derived direct and substantial economic benefits from the supracompetitive Offline Debit Card Interchange Fees for Visa transactions in the market for Offline Debit Card Network Services;

    f.    But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the market for Offline Debit Card Network Services; and

    g.    The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and expert analysis, but the Class Members estimate damages will range in the tens of billions of dollars.

377. The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the Offline Debit Card Network Services market. The supra-competitive levels of Interchange continue to the present date.

80059596.16

## ELEVENTH CLAIM FOR RELIEF:

**CLASS I VS. MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF OFFLINE DEBIT CARD INTERCHANGE FEES BY MASTERCARD AND ITS MEMBER BANKS**

378.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

379.    Throughout the relevant period, MasterCard and its Member Banks, including the Bank Defendants — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

380.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, including the Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Offline Debit Card Interchange Fees imposed on Merchants in the market for Offline Debit Card Network Services.

381.    The MasterCard Board of Directors, which includes representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard Offline Debit Card transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

382.    All of the Member Banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

383.    The contract, combination, conspiracy, and agreement alleged in this Claim has, had, and/or is likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

- 98 -

a.  Actual and potential competition in the Offline Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b.  Defendants acquired and maintained market power in the relevant markets of Offline Debit Card and Offline Debit Card Network Services;

c.  Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to Class Members in the market for Offline Debit Card Network Services;

d.  Defendants imposed supracompetitive Offline Debit Card Interchange Fees on all Class Members for MasterCard transactions in the market for Offline Debit Card Network Services;

e.  Defendants derived direct and substantial economic benefits from the supracompetitive Offline Debit Card Interchange Fees for MasterCard transactions in the market for Offline Debit Card Network Services;

f.  But for the anticompetitive conduct of MasterCard and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for MasterCard transactions in the market for Debit Card Network Services; and

g.  The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and expert analysis, but Class Members estimate damages will range in the tens of billions of dollars.

384.  The collectively fixed Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit of the MasterCard network.  Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.  MasterCard and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the Debit Card Network Services market.  The supra-competitive levels of Interchange continue to the present date.

**TWELFTH CLAIM FOR RELIEF:**

**CLASS I VS. VISA AND ITS MEMBER BANKS FOR VIOLATION OF THE CARTWRIGHT ACT, § 16700 *ET SEQ.* OF THE CALIFORNIA BUSINESS AND PROFESSIONAL CODE, UNLAWFUL PRICE FIXING OF OFFLINE DEBIT CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS**

385.　Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

386.　Throughout the relevant period, Visa and its Member Banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*).　These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

387.　The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants, and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Offline Debit Card Interchange Fees imposed on Merchants in the market for Debit Card Network Services.

388.　The Visa Board of Directors, which includes representatives from several Bank Defendants, voted to fix, raise, maintain, or stabilize the Offline Debit Card Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

389.　All of the Member Banks of Visa, including the Bank Defendants, have had actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

390.　The contract, combination, conspiracy, and agreement has had, and/or is likely to have, among other things, the following anticompetitive effects which are common to Plaintiffs and Class Members:

- 100 -

a.      Actual and potential competition in the Offline Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b.      Visa acquired and maintained market power in the relevant markets of Offline Debit and Offline Debit Card Network Services;

c.      Visa controlled, maintained, and elevated above competitive levels the Offline Debit Card Interchange Fees imposed on Class Members in the market for Debit Card Network Services;

d.      Class Members were required to pay supracompetitive Interchange Fees;

e.      Defendants derived direct and substantial economic benefits from the supracompetitive Offline Debit Card Interchange Fees in the market for Debit Card Network Services;

f.      But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Offline Debit Card Interchange Fees in order to gain business from Merchants; and

g.      But for the anticompetitive conduct of Defendants, Class Members would have saved tens of billions of dollars by avoiding the imposition of collectively fixed Interchange Fee.

391.    The collectively fixed Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit of the Visa network.  Even if some horizontal agreement were necessary to promote the efficiencies of the Visa network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.  Visa and its Member Banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the Offline Debit Card Network Services market.

392.    As a consequence of the Defendants' illegal combinations and conspiracies, all Class Members suffered a common injury to their business and property, in part, because higher Offline Debit Card Interchange Fees were imposed on them in the market for Debit

Card Network Services than would have been in the absence of the Defendants' conduct. The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and expert analysis. The supra-competitive levels of Interchange continue to the present date.

### THIRTEENTH CLAIM FOR RELIEF:
**CLASS II VS. ALL DEFENDANTS FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT 15 U.S.C. § 26, FOR VIOLATIONS OF THE SHERMAN ACT § 1, BY DEFENDANTS VISA AND MASTERCARD AND THEIR MEMBER BANKS**

393.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

394.    Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendants' continuing price fixing of Offline Debit Card Interchange Fees conduct in violation of Section 1 of the Sherman Act and the Cartwright Act, as described in this Complaint, including the Tenth through Twelfth Claims.

395.    Plaintiffs request that a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that Defendants' aforementioned conduct constitutes unlawful price fixing of Offline Debit Interchange Fees, as detailed in the Tenth through Twelfth Claims and in violation of Section 1 of the Sherman Act and the Cartwright Act.

396.    Plaintiffs further request that the Court enjoin and restrain Defendants' wrongful conduct, alleged herein, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

397.    Defendants' conduct described herein is likely to repeat unless enjoined.

- 102 -

# PART FOUR: ALLEGATIONS RELATING TO PIN-DEBIT CARD CLAIMS

## XI.

### PIN-DEBIT CARD RELEVANT MARKETS

398.    A relevant market exists, the product dimension of which is PIN-Debit Cards. The geographic dimension of this market is the United States.

399.    A relevant market exists, the product dimension of which is PIN-Debit Card Network Services. The geographic dimension of this market is the United States.

400.    A hypothetical monopolist could impose a small but significant and nontransitory increase in the price of PIN-Debit Card Network Services that are imposed on Merchants.

401.    In the late 1980's Visa feared the growth of regional PIN-Debit networks, and took steps to undermine and marginalize PIN-Debit Networks.  When those steps were not immediately successful, Visa purchased Interlink, then the largest PIN-Debit network, in 1991.  When Visa purchased Interlink it had no Interchange Fee.

402.    By the mid-1990's Visa set out to dominate both Off-Line and PIN-Debit by undertaking to cause the "convergence of Off-Line and PIN Interchange Fees.  As part of its plan to "converge" Interchange Fees for imposed on Merchants for accepting Visa's Interlink PIN-Debit cards and its Visa Check Card Offline Debit Cards, Visa has significantly increased the Interchange Fees on PIN-Debit transactions without losing significant Merchant acceptance.

403.    Visa's Interlink network has market power in the relevant market. In 2006, Interlink had a 39% market share of all PIN-Debit-transactions in the United States, as measured by transaction volume.  Upon information and belief Interlink's market share in 2008 is approaching or exceeds 50%.

- 103 -

404.    PIN-Debit Cards and PIN-Debit Card Network Services are a unique bundle of services. Consumers value the ease and speed of payment with PIN-Debit Cards relative to Offline Debit Cards and General Purpose Cards, the ability to receive cash back on POS transactions, and the enhanced security functions of PIN-Debit Cards. From a Merchant's perspective, the acceptance of PIN-Debit Cards is unique in that PIN-Debit Cards carry lower fraud rates, lower chargeback rates, and speedier settlement of funds in relation to Offline Debit Cards or General Purpose Cards.

405.    Until Visa embarked on its policy of "convergence," PIN-Debit Card Interchange Fees were significantly lower than Offline Debit Card Interchange Fees and General Purpose Card Interchange Fees. While the gap between Offline Debit and PIN-Debit Interchange Fees is shrinking, a gap between the two fee levels remains. Because of the gap in Interchange-Fee levels attributable to Offline Debit Cards and PIN-Debit Cards, few if any Merchants would discontinue the acceptance of PIN-Debit Cards in favor of other Payment Cards, even in the face of substantial increases in Interchange Fees.

406.    The fact that Visa has been able to successfully converge PIN-Debit and Offline Debit Interchange Fees without losing significant Merchant acceptance is direct evidence of the market power of Visa's Interlink Network.

407.    In recent years Visa has adopted a strategy of attempting to enter into exclusive contracts with banks with respect to issuance of Interlink cards.  These efforts and other Visa strategies are in furtherance of Visa's long-standing efforts to marginalize or eliminate the regional PIN-Debit networks as competitive threats to Visa's dominance.

408.    Barriers to entry in the PIN-Debit Card market and the PIN-Debit Card Network Services market are high. No new competitors have emerged since Visa acquired the

- 104 -

Interlink network and began to lure banks to issue Interlink cards by increasing the Interchange Fees associated with Interlink transactions.

**FOURTEENTH CLAIM FOR RELIEF:**
**CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF PIN-DEBIT CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS**

409.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as it fully set forth here.

410.    Throughout the relevant period until Visa's recent IPO, Visa and its Member Banks, including the Bank Defendants – direct horizontal competitors of each other – engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

411.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the PIN-Debit Card Interchange Fees imposed on Merchants in the market for PIN-Debit Card Network Services.

412.    The Visa Board of Directors, which included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa Interlink PIN-Debit Card transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

413.    All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

414.    The contract, combination, conspiracy, and agreement alleged in this Claim, has, had, and/or is likely to have, among others, the following anticompetitive effects which

- 105 -

are common to Plaintiffs and Class Members:

    a.    Actual and potential competition in the PIN-Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

    b.    Defendants acquired and maintained market power in the relevant markets of PIN-Debit Cards and PIN-Debit Card Network Services;

    c.    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Class Members in the market for PIN-Debit Card Network Services;

    d.    Defendants imposed supracompetitive PIN-Debit Card Interchange Fees on all Class members for Visa Interlink transactions in the market for PIN-Debit Card Network Services;

    e.    Defendants derived direct and substantial economic benefits from the supracompetitive PIN-Debit Card Interchange Fees for Visa Interlink transactions in the market for PIN-Debit Card Network Services;

    f.    But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the market for PIN-Debit Card Network Services;

    g.    The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and expert analysis, but Class Members estimate damages will range in the tens of billions of dollars.

415.    The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa Interlink network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Interlink network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few – if any – procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the PIN-Debit Card Network Services Market. The supra-competitive levels of Interchange continue to the present date.

- 106 -

**FIFTEENTH CLAIM FOR RELIEF:**

**CLASS I VS. VISA AND ITS MEMBER BANKS FOR VIOLATION OF THE CARTWRIGHT ACT, § 16700 *ET SEQ.* OF THE CALIFORNIA BUSINESS AND PROFESSIONAL CODE, UNLAWFUL PRICE FIXING OF PIN-DEBIT CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS**

416.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

417.    Throughout the relevant period, Visa and its Member Banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*).  These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

418.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants, and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the PIN-Debit Card Interchange Fees imposed on Merchants in the market for PIN-Debit Card Network Services.

419.    The Visa Board of Directors, which includes representatives from several Bank Defendants, voted to fix, raise, maintain, or stabilize the PIN-Debit Card Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

420.    All of the Member Banks of Visa, including the Bank Defendants, have had actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

421.    The contract, combination, conspiracy, and agreement has had, and/or is likely to have, among other things, the following anticompetitive effects which are common to

- 107 -

Plaintiffs and Class Members:

    a.    Actual and potential competition in the PIN-Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

    b.    Visa acquired and maintained market power in the relevant markets of PIN-Debit Cards and PIN-Debit Card Network Services;

    c.    Visa controlled, maintained, and elevated above competitive levels the PIN-Debit Card Interchange Fees imposed on Class Members in the market for PIN-Debit Card Network Services;

    d.    Class members were required to pay supracompetitive Interchange Fees;

    e.    Defendants derived direct and substantial economic benefits from the supracompetitive PIN-Debit Card Interchange Fees in the market for Debit Card Network Services;

    f.    But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the PIN-Debit Card Interchange Fees in order to gain business from Merchants; and

    g.    But for the anticompetitive conduct of Defendants, Class Members would have saved tens of billions of dollars by avoiding the imposition of collectively fixed Interchange Fee.

422.    The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the PIN-Debit Card Network Services market.

423.    As a consequence of the Defendants' illegal combinations and conspiracies, Class Members suffered a common injury to their business and property, in part, because

- 108 -

higher PIN-Debit Card Interchange Fees were imposed on them in the market for Debit Card Network Services than would have been in the absence of the Defendants' conduct. The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and expert analysis. The supra-competitive levels of Interchange continue to the present date.

### SIXTEENTH CLAIM FOR RELIEF:
**CLASS II VS. VISA AND ITS MEMBER BANKS FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT FOR VIOLATIONS OF THE SHERMAN ACT § 1, BY DEFENDANT VISA AND ITS MEMBER BANKS**

424. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

425. Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendant Visa and Bank Defendants' continuing conduct in violation of Section 1 of the Sherman Act and the Cartwright Act, as described in this Complaint, including the First through Twelfth Claims.

426. Plaintiffs request that the Court enter a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that Defendants' aforementioned conduct constitutes unlawful price fixing of Offline Debit Interchange Fees, as detailed in the Fourteenth Claim and in violation of Section 1 of the Sherman Act and the Cartwright Act.

427. Defendants' conduct described herein is likely to continue unless enjoined.

428. Plaintiffs further request that the Court enjoin and restrain Defendants' wrongful conduct, alleged herein, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

### PART FIVE: ALLEGATIONS RELATING TO DEFENDANTS' CONTINUING VIOLATION OF SECTION ONE OF THE SHERMAN ACT

### VII.

429. Far from removing their conduct from Section 1 of the Sherman Act, the

reorganization attempts by the Networks have merely changed the form of the conspiracy to fix Interchange Fees imposed on Merchants in the Relevant Market.

430.    While the identity of the body that sets the Networks' uniform schedules of default Interchange Fees changed after the restructuring attempts and the IPOs, those actions did not affect the principle that a default Interchange Fee would apply to all Visa and MasterCard transactions and that all Issuing Banks of Visa, and those of MasterCard, were guaranteed identical Interchange Fees on similar transactions.

431.    The Visa and MasterCard Boards of Directors even after the Networks' restructuring attempts and IPOs have ultimate authority to establish uniform schedules of default Interchange Fees for their respective Networks.  iIn the case of MasterCard, the Board has delegated that authority to management. The only thing that has changed since then is the fact that a majority of the Network's respective Boards of Directors are elected by public shareholders rather than by the Member Banks.

432.    It was the Member Banks themselves, acting through the Networks' respective Boards of Directors, which adopted the Networks' respective plans to restructure themselves and conduct IPOs in an attempt to continue their anticompetitive practices outside of the scope of Section 1 of the Sherman Act.

433.    Ever after the Networks' restructuring attempts and IPOs, each Member Bank that participates in the Visa or MasterCard network agrees to abide by the respective Network's bylaws and rules.

434.    For example, after MasterCard's IPO, MasterCard's Member Banks remain bound by the pre-IPO license agreement that licenses the MasterCard trademark to the banks for their use, on the express condition that the banks subject themselves to MasterCard's

- 110 -

rules. After the IPO, MasterCard's rules continued to provide that MasterCard Member Banks agreed among themselves on the setting of Interchange Fees.

435. And because those bylaws and rules remain unchanged after the restructuring attempts and the IPOs, every Merchant that accepts Visa or MasterCard Payment Cards has a Merchant agreement with a Visa or MasterCard Member Bank, which requires the Merchant to abide by the Networks' bylaws and rules.

436. Just as before the Networks' restructuring attempts and the IPOs, the Networks' bylaws and rules require that all Merchants that accept Visa or MasterCard Payment Cards (with the exception of the handful of Merchants that choose not to accept the Networks' Credit or Offline Debit Cards) accept all Payment Cards of that network, regardless of the identity of the Issuing Bank or the level of Interchange Fee attributable to a particular card.

437. Even after the Networks' restructuring attempts and the IPOs, the Networks' bylaws and rules require that their default uniform schedules of Interchange Fees apply to all transactions, regardless of the identity of the bank that issued the card that is presented to the Merchant for a particular transaction. Each Member Bank Issuer is guaranteed by Visa, and by MasterCard, that it will receive Interchange Fees identical to the Interchange Fees received by every other Issuer, on similar transactions. This is true regardless of the cost-structure, efficiency, size, location or any other characteristic of the Issuer.

438. Even after the Networks' restructuring attempts and the IPOs, the Networks continue to monitor their Member Banks' compliance with the default interchange fees by supervising the application of the correct, uniform, default interchange fee to each transaction processed over the Visa or MasterCard network. By monitoring the banks' compliance with

- 111 -

their uniform schedules of default interchange fees, the Networks protect each of its Member Banks from "cheating" by banks that would attempt to circumvent their anticompetitive scheme.

439.    Because the Member Banks agree to abide by the Networks' rules and regulations as a condition of participating in the Networks, and because those rules require the application of uniform schedules of default Interchange Fees on all payment card transactions, as a condition of participating in the Networks, the Member Banks' agreements to participate in the Networks is conditioned upon all other Member Banks making the same agreement.

440.    Even after the Networks' restructuring attempts and the IPO, each Member Bank that issues Payment Cards or acquires Merchants for Visa or MasterCard understands that all other banks that participate in that network agree to abide by the same bylaws and rules, including those rules that apply the network's uniform schedule of default Interchange Fee to every transaction on the network.

441.    Even after the Networks' restructuring attempts and the IPO, a bank would not be able to impose supracompetitive Interchange Fees without an agreement by all the other participating banks to impose Interchange Fees according to the same uniform schedule of default Interchange Fees.

442.    Although Visa and MasterCard have changed their corporate governance structures, the Bank Defendants and other Member Banks continue to exert pressure on and enter into agreements with the Networks to increase Interchange Fees.

## SEVENTEENTH CLAIM FOR RELIEF:

**CLASS I V. VISA AND ITS MEMBER BANKS FOR DAMAGES UNDER SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, CONTINUING VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**

443.    Plaintiffs repeat and re-allege each and every allegation as if fully set forth herein.

444.    Since Visa's recent IPO, Visa and its Member Banks, including the Bank Defendants – direct horizontal competitors of each other – have engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Member Banks, including the Bank Defendants, have simply designated a common agent to fix the levels of Interchange Fees to which all agree to adhere.

445.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Interchange Fees for Credit Cards, Offline Debit Cards, and PIN-Debit Cards imposed on Merchants in the respective Relevant Markets.

446.    The Visa Board of Directors established and approved uniform schedules of Interchange Fees for all Visa Credit Card, Offline Debit Card, and PIN-Debit Card transactions in the Relevant Markets. Visa's Member Banks, including the Bank Defendants, in turn agree to abide by Visa's bylaws and Operating Regulations, which apply Visa's uniform schedules of default Interchange Fees on all Visa transaction. Each Member Bank agrees and understands that all other Member Banks will agree to abide by the same uniform schedule of default Interchange Fees.

- 113 -

447. All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

448. The contract, combination, conspiracy, and agreement alleged in this Claim, has had, and/or is likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

    a.    Actual and potential competition in the relevant markets was substantially excluded, suppressed, and effectively foreclosed;

    b.    Defendants acquired and maintained market power in the relevant markets;

    c.    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Class Members in the relevant markets;

    d.    Defendants derived direct and substantial economic benefits from the supracompetitive Interchange Fees imposed on Merchants in the relevant market;

    e.    But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the relevant markets;

    f.    The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and expert analysis, but Class Members estimate damages will range in the tens of billions of dollars.

449. Visa's uniform schedule of default Interchange Fees is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa network. Even if some agreement were necessary to promote the efficiencies of the Visa network, Visa's uniform schedules of default Interchange Fees is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few – if any – procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the relevant markets.

- 114 -

**EIGHTEENTH CLAIM FOR RELIEF:**

**CLASS I V. MASTERCARD AND ITS MEMBER BANKS UNDER SECTION 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR CONTINUING VIOLATIONS OF SECTION 1OF THE SHERMAN ACT, 15 U.S.C. § 1**

450.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

451.    Since MasterCard's recent IPO, MasterCard and its Member Banks, including the Bank Defendants – direct horizontal competitors of each other – have engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Member Banks, including the Bank Defendants, have simply designated a common agent to fix the levels of Interchange Fees to which all agree to adhere.

452.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, including the Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Interchange Fees for Credit Cards, and Offline Debit Cards imposed on Merchants in the respective Relevant Markets.

453.    The MasterCard Board of Directors established and approved uniform schedules of Interchange Fees for all MasterCard Credit Card, and Offline Debit Card transactions in the Relevant Markets. MasterCard's Member Banks, including the Bank Defendants, in turn agree to abide by MasterCard's Bylaws and Operating Regulations, which apply MasterCard's uniform schedules of default Interchange Fees on all MasterCard transaction. Each Member Bank agrees and understands that all other Member Banks will agree to abide by the same uniform schedule of default Interchange Fees.

- 115 -

454.    All of the Member Banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

455.    The contract, combination, conspiracy, and agreement alleged in this Claim, has had, and/or is likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

a.    Actual and potential competition in the relevant markets was substantially excluded, suppressed, and effectively foreclosed;

b.    Defendants acquired and maintained market power in the relevant markets;

c.    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Class Members in the relevant markets;

d.    Defendants derived direct and substantial economic benefits from the supracompetitive Interchange Fees imposed on Merchants in the relevant market;

e.    But for the anticompetitive conduct of MasterCard and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for MasterCard transactions in the relevant markets;

f.    The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and expert analysis, but Class Members estimate damages will range in the tens of billions of dollars.

456.    MasterCard's uniform schedule of default Interchange Fees is illegal. It is not necessary to accomplish any procompetitive benefit of the MasterCard Network. Even if some agreement were necessary to promote the efficiencies of the MasterCard Network, MasterCard's uniform schedules of default Interchange Fees is significantly more restrictive than necessary to bring about those efficiencies. MasterCard and its Member Banks' price fixing achieves few – if any – procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive

- 116 -

effects in the relevant markets.

**NINETEENTH CLAIM FOR RELIEF:**

**CLASS I VS. VISA AND ITS MEMBER BANKS FOR VIOLATION OF THE CARTWRIGHT ACT § 16700 *ET SEQ*. OF THE CALIFORNIA BUSINESS AND PROFESSIONAL CODE, CONTINUING ILLEGAL CONDUCT BY VISA AND ITS MEMBER BANKS**

457.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

458.    Since Visa's recent IPO, Visa and its Member Banks, including the Bank Defendants – direct, horizontal competitors of each other – have engaged in unlawful contracts, combinations, and conspiracies in an unreasonable retrain of interstate trade and commerce in violation of the Cartwright Act (Cal. Bus. & Prof. Code, § *et seq*.).  These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California. The Member Banks, including the Bank Defendants, have simply designated a common agent to fix the levels of Interchange Fees to which all agree to adhere.

459.    The unlawful contacts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Interchange Fees for Credit Cards, Offline Debit Cards, and PIN-Debit Cards imposed on Merchants in the respective Relevant Market.

460.    The Visa Board of Directors established and approved uniform schedules of Interchange Fees for all Visa Credit Card, Offline Debit Card, and PIN-Debit Card transactions in the Relevant Markets. Visa's Member Banks, including the Bank Defendants, in turn agree to abide by Visa's bylaws and Operating Regulations, which apply Visa's uniform schedules of default Interchange Fees on all Visa transaction. Each Member Bank

- 117 -

agrees and understands that all other Member Banks will agree to abide by the same uniform schedule of default Interchange Fees.

461.    All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

462.    The contract, combination, conspiracy, and agreement alleged in this Claim, has, had, and/or is likely to have, among others, the following effects which are common to Plaintiffs and Class Members:

a.    Actual and potential competition in the relevant markets was substantially excluded, suppressed, and effectively foreclosed;

b.    Defendants acquired and maintained market power in the relevant markets;

c.    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Class Members in the relevant markets;

d.    Defendants derived direct and substantial economic benefits from the supracompetitive Interchange Fees imposed on Merchants in the relevant market;

e.    But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the relevant markets;

f.    The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and expert analysis, but Class Members estimate damages will range in the tens of billions of dollars.

463.    Visa's uniform schedule of default Interchange Fees is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa network. Even if some agreement were necessary to promote the efficiencies of the Visa network, Visa's uniform schedules of default Interchange Fees is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few – if any –

- 118 -

procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the relevant markets.

## TWENTIETH CLAIM FOR RELIEF:

**CLASS II VS. ALL DEFENDANTS FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT AND 28 U.S.C. § 201 FOR VIOLATIONS OF THE SHERMAN ACT, § 1, BY DEFENDANTS VISA AND MASTERCARD AND THEIR MEMBER BANKS**

464.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

465.     Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendants' continuing conduct in violation of Section 1 of Sherman Act, as described in this Complaint, including Claims Seventeen and Eighteen.

466.     Plaintiffs request a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that Defendants' aforementioned conduct constitutes unlawful price fixing Interchange Fees as detailed in Claims Seventeen and Eighteen and in violation of Section 1 of the Sherman Act and the Cartwright Act.

467.     Defendants' conduct described herein is likely to continue unless enjoined.

468.     Plaintiffs further request that the Court enjoin and restrain Defendants' wrongful conduct, alleged herein, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

## XI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.     Declare, adjudge, and decree that Defendants have committed the violations of the federal and state antitrust laws as alleged herein;

B.     Order that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing the violations of the Cartwright and Sherman Acts, in which they and co-

- 119 -

conspirators have been engaged;

C.     Order that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing any other violations of statutes having a similar purpose or effect; and

D.     Pursuant to applicable law, award monetary damages sustained by the Representative Plaintiffs and Class Members for the fullest time period permitted by the applicable statutes of limitations and the purported settlement and release in *In re Visa Check/MasterMoney Antitrust Litigation,* in an amount to be proved at trial, attorneys' fees, and costs of suit; and award all other and further relief as this Court may deem just and proper.

## XII.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.


Dated:  Minneapolis, Minnesota
        January 29, 2009

By:    <u>*S/ Craig Wildfang*</u>
      K. Craig Wildfang
      Co-Lead Counsel for Plaintiffs

**Robins, Kaplan, Miller & Ciresi L.L.P.**
K. Craig Wildfang (kcwildfang@rkmc.com)
Thomas J. Undlin (tjundlin@rkmc.com)
Thomas B. Hatch (tbhatch@rkmc.com)
Janet C. Evans (jcevans@rkmc.com)
Stacey P. Slaughter (spslaughter@rkmc.com)
Ryan W. Marth (rwmarth@rkmc.com)
M. Tayari Garrett (mtgarrett@rkmc.com)
Ross A. Abbey (raabbey@rkmc.com)
George D. Carroll (gdcarroll@rkmc.com)
Rachel L. Osband (rlosband@rkmc.com)
Jesse M. Calm (jmcalm@rkmc.com)
Amelia N. Jadoo (anjadoo@rkmc.com)
Sarah E. Hudleston (sehudleston@rkmc.com)
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402
Tel. (612) 349-8500
Fax (612) 349-4181

**Berger & Montague, P.C.**
H. Laddie Montague (hlmontague@bm.net)
Bart Cohen (bcohen@bm.net)
Merrill G. Davidoff (mdavidoff@bm.net)
Michael J. Kane (mkane@bm.net)
1622 Locust Street
Philadelphia, PA 19103
Tel. (215) 875-3000
Fax (215) 875-4604

**Coughlin Stoia Geller Rudman & Robbins LLP**
Bonny E. Sweeney (bonnys@csgrr.com)
David Mitchell (davidml@csgrr.com)
655 West Broadway
Suite 1900
San Diego, CA 92101
Tel. (619) 231-1058
Fax (619) 231-7423

**Fine Kaplan & Black**
Allen Black (ablack@finekaplan.com)
Elise Singer (esinger@finekaplan.com)
1835 Market Street
28th Floor
Philadelphia, PA 19103
Tel. (215) 567-6565
Fax (215) 230-8735

**Freedman, Boyd, Daniels, Hollander & Goldberg, P.A.**
Joseph Goldberg (jg@fbdlaw.com)
20 First Plaza
Suite 700
Albuquerque, NM 87102
Tel. (505) 842-9960
Fax (505) 842-0761

**Hulett, Harper, Stewart, LLP**
Dennis J. Stewart (dennis@hulettharper.com)
550 West C Street
Suite 1600
San Diego, CA 92101
Tel. (619) 338-1133
Fax (619) 338-1139

80059596.16

**Abraham, Fruchter & Twersky, LLP**
Mitchell M. Z. Twerksy (mtwerksy@aftlaw.com)
One Penn Plaza
Suite 2805
New York, NY 10019
Tel. (212) 279-5050
Fax (212) 279-3655

**Ann White Law Offices, P.C.**
Ann White (awhite@awhitelaw.com)
101 Greenwood Avenue
5th Floor
Jenkintown, PA 19046
Tel. (215) 481-0274
Fax (215) 481-0271

**Barrack, Rodos & Bacine**
William Ban (wban@barrack.com)
Jeffrey Gittleman (jgittleman@barrack.com)
Gerald Rodos (grodos@barrack.com)
Mark Rosen (mrosen@barrack.com)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel. (215) 963-0600
Fax (215) 963-0838

**Beasley Firm, LLC**
Slade McLaughlin (shm@beasleyfirm.com)
1125 Walnut Street
Philadelphia, PA 19107
Tel. (215) 592-1000
Fax (215) 592-8360

**Bernard M. Gross, P.C.**
Warren Rubin (warren@bernardmgross.com)
Suite 450
John Wanamaker Building
Juniper and Market Street
Philadelphia, PA 19107
Tel. (215) 561-3600
Fax (215) 561-3000

**Boni & Zack LLP**
Michael Boni (mboni@bonizack.com)
Joanne Zack (jzack@bonizack.com)
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel. (610) 822-0201
Fax (610) 822-0206

**Bonnett, Fairbourn, Friedman & Balint**
Francis J. Balint, Jr. (fbalint@bffb.com)
Andrew S. Friedman (afriedman@bffb.com)
2901 North Central Avenue
Suite 1000
Phoenix, AZ 85012
Tel. (602) 274-1100
Fax (602) 274-1199

**Chestnut & Cambronne, P.A.**
Karl L. Cambronne (kcambronne@chestnutcambronne.com)
Jeffrey Bores (jbores@chestnutcambronne.com)
Becky Erickson (berickson@chestnutcambronne.com)
Stewart C. Loper (sloper@chestnutcambronne.com)
Brian N. Toder (btoder@chestnutcambronne.com)
3700 Mithun Tower
222 South Ninth Street
Minneapolis, MN 55402
Tel. (612) 339-7300
Fax (612) 336-2940

**Chitwood, Harley Harnes LLP**
Craig Harley (charley@chitwoodlaw.com)
Leslie G. Toran (ltoran@chitwoodlaw.com)
James M. Wilson (jwilson@chitwoodlaw.com)
2300 Promenade Two
1230 Peachtree Street NE
Atlanta, GA 30309
Tel. (404) 873-3900
Fax (404) 876-4476

**Drubner & Hartley, LLC**
Charles S. Hellman (chellman@dholaw.com)
1540 Broadway
37th Floor
New York, NY 10036
Tel. (212) 736-2121
Fax (212) 736-2122

James Hartley (jhart@dholaw.com)
500 Chase Parkway
Waterbury, CT 06708
Tel. (203) 597-6314
Fax (203) 753-6373

**Edelson & Associates, LLC**
Marc H. Edelson (medelson@hofedlaw.com)
45 West Court Street
Doylestown, PA 18901
Tel. (215) 230-8043
Fax (215) 230-8735

**Finkelstein Thompson**
Douglas G. Thompson (dgt@ftllaw.com)
Richard M. Volin (rmv@ftllaw.com)
1050 – 30th Street NW
Washington, DC 20007
Tel. (202) 337-8000
Fax (202) 337-8090

**Foote, Meyers, Mielke & Flowers, LLC**
Robert Foote (rmf@foote-meyers.com)
John C. Ireland (jireland@foote-meyers.com)
Dave Neuman (dneuman@foote-meyers.com)
416 S. Second Street
Geneva, IL 60134
Tel. (630) 232-6333
Fax (630) 845-8982

**Friedman Law Group LLP**
Gary B. Friedman (gfriedman@flgllp.com)
270 Lafayette Street
Suite 1410
New York, NY 10012
Tel. (212) 680-5150
Fax (212) 277-1151

**Giskan, Solotaroff, Anderson & Stewart**
Catherine Anderson (canderson@gslawny.com)
Oren Giskan (ogiskan@gslawny.com)
Jason Solotaroff (jsolotaroff@gslawny.com)
11 Broadway
Suite 2150
New York, NY 10004
Tel. (212) 847-8315
Fax (212) 473-8096

**Goldman, Scarlato & Karon, P.C.**
Daniel Karon (karon@gsk-law.com)
55 Public Square, Suite 1500
Cleveland, OH 44113
Tel. (216) 622-1851
Fax (216) 622-1852

- 124 -

**Franklin, Gray & White**
Mark K. Gray (mkgrayatty@aol.com)
505 West Ormsby Avenue
Louisville, KY  40203
Tel. (502) 585-2060
Fax (502) 581-1933

**Gustafson Gluek PLLC**
Daniel E. Gustafson (dgustafson@gustafsongluek.com)
Dan Hedlund (dhedlund@gustafsongluek.com)
Jason Kilene (jkilene@gustafsongluek.com)
650 Northstar East
608 Second Avenue South
Minneapolis, MN  55402
Tel. (612) 333-8844
Fax (612) 339-6622

**Jaffe + Martin Law Office**
Arthur L. Martin (amartin@lawjm.com)
Howard M. Jaffe (hjaffe@lawjm.com)
2029 Century Park East, Suite 2100
Los Angeles, CA  90067
Tel. (310) 226-7770

**Kohn, Swift & Graf, P.C.**
Robert J. LaRocca (rlarocca@kohnswift.com)
Joshua Snyder (jsnyder@kohnswift.com)
Kate Reznick (kreznick@kohnswift.com)
One South Broad Street
Suite 2100
Philadelphia, PA  19107
Tel. (215) 238-1700
Fax (215) 238-1968

**Koskoff Koskoff & Bieder PC**
Richard Bieder (rbieder@koskoff.com)
William Bloss (bbloss@koskoff.com)
Cynthia Bott (cbott@koskoff.com)
Neal A. DeYoung (ndeyoung@koskoff.com)
Lillian C. Gustilo (lgustilo@koskoff.com)
Michael Koskoff (mkoskoff@koskoff.com)
Anthony Ponvert (aponvert@koskoff.com)
Craig Smith (csmith@koskoff.com)
350 Fairfield Avenue
Bridgeport, CT  06604
Tel. (203) 336-4421
Fax (203) 368-3244

**Labaton Sucharow  LLP**
Craig L. Briskin (cbriskin@labaton.com)
Bernard Persky (bpersky@labaton.com)
Hollis L. Salzman (hsalzman@labaton.com)
100 Park Avenue
New York, NY  10017
Tel. (212) 907-0700
Fax (212) 818-0477

**Law Office of Jerald M. Stein**
Jerald M. Stein (jmslaw@nyc.rr.com)
Scott Klein (sklein@mintandgold.com)
470 Park Avenue South
Floor 10 North
New York, NY  10016
Tel. (212) 481-4848
Fax (212) 481-6803

**Lieff, Cabraser, Heimann & Bernstein, LLP**
Joseph R. Saveri (jsaveri@lchb.com)
275 Battery Street, 30th Floor
San Francisco, CA  90411
Tel. (415) 956-1000
Fax (415) 956-1008

Hector D. Geribon (hgeribon@lchb.com)
David P. Gold (dgold@lchb.com)
780 Third Avenue, 48th Floor
New York, NY  10017
Tel. (212) 355-9500
Fax (212) 355-9592

**Lockridge Grindal Nauen P.L.L.P.**
W. Joseph Bruckner (wjbruckner@locklaw.com)
Richard A. Lockridge (ralockridge@locklaw.com)
Charles N. Nauen (cnnauen@locklaw.com)
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel. (612) 339-6900
Fax (612) 339-0981

**Murray, Frank & Sailer LLP**
Eric J. Belfi (ebelfi@murrayfrank.com)
Brian Brooks (bbrooks@murrayfrank.com)
275 Madison Avenue
8th Floor
New York, NY  10016
Tel. (212) 682-1818
Fax (212) 682-1892

**Pomerantz, Haudek, Block, Grossman & Gross**
Jason Cowart (jscowart@pomlaw.com)
Stanley Grossman (smgrossman@pomlaw.com)
J. Douglas Richards (drichards@pomlaw.com)
Michael M. Buchman (mbuchman@pomlaw.com)
100 Park Avenue, 26th Floor
New York, NY 10017
Tel. (212) 661-1100
Fax (212) 661-8665

**Reinhardt Wendorf & Blanchfield**
Mark Reinhardt (mreinhardt@comcast.net)
332 Minnesota Street
E1250 First National Bank Building
St. Paul, MN 55101
Tel. (651) 287-2100
Fax (651) 287-2103

**Richard L. Jasperson, P.A.**
Richard L. Jasperson (jaspersonr@cs.com)
E1000 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel. (651) 223-5039
Fax (651) 223-5802

**Roda Nast P.C.**
Dianne M. Nast (dnast@rodanast.com)
801 Estelle Drive
Lancester, PA 17601
Tel. (717) 892-3000
Fax (717) 892-1200

**Scott & Scott**
Edmund Searby (esearby@scott-scott.com)
PO Box 192
108 Norwich Avenue
Colchester, CT 06415
Tel. (860) 537-5537
Fax (860) 537-4432

**Seeger Weiss LLP**
Jonathan Shub (jshub@seegerweiss.com)
1515 Market Street
Suite 1380
Philadelphia, PA 19102
Tel. (215) 564-2300
Fax (215) 851-8029

**Steyer Lowenthal Boodrookas Alvarez & Smith LLP**
Allan Steyer (asteyer@steyerlaw.com)
One California Street
Third Floor
San Francisco, CA 94111
Tel. (415) 421-3400
Fax (415) 421-2234

**Shepherd, Finkelman, Miller & Shah, LLP**
Patrick Klingman (pklingman@sfmslaw.com)
James E. Miller (jmiller@classactioncounsel.com)
Laurie Rubinow (lrubinow@sfmslaw.com)
65 Main Street
Chester, CT 06412
Tel. (860) 526-1100
Fax (860) 526-1120

Natalie Finkelman Bennett (nfinkelman@classactioncounsel.com)
Paul Rettinger (prettinger@classactioncounsel.com)
Nathan Zipperian (nzipperian@classactioncounsel.com)
30 East State Street
Media, PA 19063
Tel. (610) 891-9880
Fax (610) 891-9883

**Spector, Roseman & Kodroff**
William Caldes (wcaldes@srk-law.com)
Jay S. Cohen (jcohen@srk-law.com)
Jeff Corrigan (jcorrigan@srk-law.com)
David Felderman (dfelderman@srk-law.com)
Gene Spector (espector@srk-law.com)
1818 Market Street
Suite 2500
Philadelphia, PA 19103
Tel. (215) 496-0300
Fax (215) 496-6611

**Starr, Gern, Davison & Rubin, P.C.**
Jonathan J. Lerner (jlerner@starrgern.com)
Nicholas Stevens (nstevens@starrgern.com)
103 Eisenhower Parkway
Roseland, NJ 07068
Tel. (973) 403-9200
Fax (973) 226-0031

**Weinstein, Kitchenoff & Asher, LLC**
Steven A. Asher (asher@wka-law.com)
Robert S. Kitchenoff (kitchenoff@wka-law.com)
1845 Walnut Street
Suite 1100
Philadelphia, PA  19103
Tel. (215) 545-7200
Fax (215) 545-6535

**Whatley Drake & Kallas LLC**
Richard Rouco (rrouco@whatleydrake.com)
Joe R. Whatley (jwhatley@whatleydrake.com)
2001 Park Place
Suite 1000
Birmingham, AL  35203
Tel. (205) 328-9576
Fax. (205) 328-9669

**Wolf Popper, LLP**
Marian P. Rosner (mrosner@wolfpopper.com)
Patricia I. Avery (pavery@wolfpopper.com)
845 Third Avenue
New York, NY  10022-6601
Tel. (212) 759-4600
Fax (212) 486-2093